Mark **METZGER**, L.T. **Bradt**, and Joe Alfred **Izen**, Jr., Appellants,

v.

Judy **SEBEK**, Earle **Lilly**, Piro & **Lilly**, P.C., Depelchin Children's Center, Baylor College of Medicine, Ernest Kendrick, Michael D. Cox, Jean Guez, Barbara Taylor, Luisa Maria Acevedo Lohner, Ann M. Hodges, and Joel A. Nass, Appellees.

No. 01–92–00912–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 29, 1994.

Rehearing Overruled Nov. 10, 1994.

L.T. "Butch" Bradt, Houston, Joe Alfred Izen, Jr., Bellaire, for appellants.

Randall D. Wilkins, Edward J. Hennessy, Donald M. Hudgins, Sheryl L. Mulliken Fike, James H. Barker, M. Karinne McCullough, Alan Magenheim, Donald B. McFall, R. Edward Perkins, Richard A. Sheehy, Lauren L. Beck, Roger Townsend, Sarah B. Duncan, Jennifer Bruch Hogan, William R. Pakalka, Nancy J. Locke, Houston, for appellees.

Before DUGGAN, HUTSON–DUNN and PRICE[1], JJ.

## OPINION

PRICE, Justice (Assigned).

The plaintiff in a multi-cause of action lawsuit appeals from a directed verdict against him on all causes of action. He and his trial attorneys also appeal from sanctions entered against them by the trial judge. We affirm parts of the judgment, reverse and remand parts of the judgment, and reverse and render part of the judgment. We dismiss part of the appeal for want of jurisdiction.

### I. The Evidence

The trial, before it was terminated by the judge's directed verdict, lasted over a month. The following evidence was adduced, in front of the jury unless otherwise noted.

Mark Metzger (Metzger) and his wife Judy (Sebek[2]) had three children: Marcus, Larry, and Danielle. In 1986, Metzger and Sebek separated. In October of that year, Metzger filed for divorce, alleging adultery. In the divorce proceeding, Metzger was represented by Burta Raborn (Raborn). Earle Lilly (Lilly) and Joel Nass (Nass) represented Sebek. Metzger was awarded sole managing conservatorship of the children, but he later agreed to joint managing conservatorship with Sebek.

The divorce case was ordered to "nonbinding" arbitration in November, 1986. Metzger testified in a bill of exception that Lilly, in January, 1987, "entered a pleading in the court record requesting the—it was an order for Child Protective Services, which

was infusing into the case child abuse allegations." Although the divorce court's file is in our record, no such pleading is contained within it, or anywhere else in the record. We have no pleading in our record that "infus[es] into the case child abuse allegations" in or around January, 1987.

At some point during early 1987, Larry, now three and a half years old, was enrolled in Montessori Morning Glory School (the School). On February 20, personnel at the School reported a handprint bruise on Larry's stomach to Childrens' Protective Services (CPS). According to Sebek, this was the first time that Larry manifested a sign of abuse. The CPS record indicates that the "[p]hysical abuse has been substantiated," but that the "[p]erpetrator [is] unknown." Also in March, 1987, the School's progress reports on Larry indicated that he was unable to complete his work, he attacked other children, and he cried in a "heavy, emotional, depressed" manner.

Late in April, two of Larry's teachers at the School met separately with Metzger and Sebek to convey their concerns and recommend counseling. Sebek asked one of Larry's teachers, Rebecca Kugler (Kugler), who was also the School's director, to recommend a psychologist. Kugler referred her to several psychologists, among them Barbara Taylor (Taylor). The non-binding arbitration ended, unsuccessfully, on April 28.

On April 29, Sebek and Larry met with Taylor. While Sebek and Taylor talked, Larry began playing with the dolls in the meeting room. According to Taylor, Larry's play with the dolls was disturbing:

Larry took the dolls and stripped their clothes off. I mean ... had them all undressed.... It was a frantic activity. That was the first thing that caught my attention.

The next thing that he did, which was most unusual, was he took Scotch tape ... and he taped his own mouth, after which he took the Scotch tape and bound the legs of

---

1. The Honorable Frank C. Price, former justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

2. "Sebek" is Judy's last name since a subsequent marriage.

the dolls together and taped them. He had ... a quality to his play that was eerie. [H]e would laugh and he would have this glimmer on his face that was very bizarre and strange ... and I said: There is something very wrong here.

[T]his activity and this stripping of the dolls and taping of the legs and then eventually at one point having dolls humping one another from behind and hiding under the stairwell—I have a baby doll in my office that's a regular-size baby doll that he took behind the chair. He would leer over the chair at me and undress the baby doll and always with Scotch tape over his mouth and always was taping the mouths and the legs of the dolls, and the significance of that to me was that there is something that's very secret, that he is not supposed to tell, and that the tape over his mouth is an indication of the secretiveness of this.

Based on his appearance and his play, Taylor suspected that Larry was being sexually abused.

During this first meeting between Sebek, Larry, and Taylor, Sebek told Taylor that Metzger had twice previously been reported to CPS for child abuse. Shortly after the meeting, Taylor called Marie Senegel (Senegel), the CPS case worker, and informed Senegel of her suspicions. During their conversation, Senegel told Taylor that she was planning on closing the file on Metzger. Taylor asked Senegel to keep the case open, and Senegel agreed.

Taylor also attempted to get Metzger to meet with her. These attempts were unsuccessful.

Taylor next saw Larry on May 4. At that time, Larry

reenacted the sexual theme of stripping the clothes off the dolls, taping his mouth, taping their legs, and having the dolls hump one another ... There were different configurations. Sometimes the father doll is behind the child doll ...

That same day, Taylor called Kugler to obtain some information on the Metzger family. Kugler told Taylor about an incident when Metzger knocked Larry down and kicked

him in the stomach because he had tripped over his shoelace. She also related an incident in which Larry "saw a little girl with a loving father and kicked the little girl in the head." He then "cracked up and began to sob and cry." Kugler did not implicate anyone in sexual abuse.

On May 7 and May 9, Metzger, Larry, and Marcus went to see Dr. Jerome Brown (Brown), another psychologist. Dr. Brown documented the following observations and conclusions:

The evaluation results for the children reveal difficulties for both of them, especially for the youngest, Larry. They are both troubled children ... Larry ... seems to be a more disturbed child....

With regard to the specific issue of sexual abuse of [Larry], there is no clear or definite way to use the evaluation results to determine whether or not such actions ever occurred. However, it can be stated that Mr. Metzger does not exhibit the personality characteristics, behaviors, background or attitudes typically associated with individuals who do commit such inappropriate acts. The level of involvement he has with [Larry] is unusual for the typical sex offender....

In summary, the present situation involving allegations of sexual abuse by Mr. Metzger of ... Larry should be viewed with considerable skepticism, in my opinion. Mr. Metzger simply does not exhibit the characteristics, attitudes or behavioral background of individuals who molest their children....

On May 11, Brown wrote Kugler, asking her to fill out a report on Larry's "functioning at school." Dr. Kugler's response included the following remarks:

[Larry] attacks children physically by hitting, kicking, throwing things at them, pushing, pouring water on them from a drinking glass, spitting, and pulling on clothing....

He is exhibiting confusion about discipline and love, appropriate physical contact with others and other alarming behaviors.... Larry undresses dolls and physically abuses them. He has made attempts to undress shy children and sleeping children

and on one occasion attempted to insert his finger into the anus of another child.... Larry places tape over his mouth when he sees tape on the art shelf of the classroom.

In late May or early June, Kugler and another teacher met with Metzger and Sebek to discuss Larry's behavior at the School, which had worsened. Kugler told Metzger and Sebek that Larry "was showing signs of sexual acting-out behavior, that the boy had become more aggressive, he was hitting other children...." Kugler requested that Metzger and Sebek remove Larry from the School because of his "aggressive behavior." Kugler also told Metzger and Sebek that, as a result of Larry's sexual acting-out, the School was going to report to CPS about Larry's sexually oriented behavior.

On June 2, Sebek moved the court to conduct a social study. Lilly suggested that the court appoint Dr. Jean Guez (Guez), a psychologist, to conduct the study. Raborn spoke to court personnel about Guez and approved Lilly's suggestion. The court appointed Guez, specifying that she should "perform psychological testing and evaluation of the children and the parties" and to make a written report of her findings to the court.

On June 3, Kugler reported to Senegel at CPS. Another CPS worker in turn reported to the Houston Police Department (HPD). HPD assigned Officer Sherry Turner Anderson (Anderson) to the case.

On June 4, Senegel called one of Larry's other teachers at the School. The teacher confirmed that Larry had been sexually acting-out in class.

On June 10, Senegel visited Metzger and Larry at Metzger's home. Senegel discussed "inappropriate touching" with Larry:

We discussed the parts of the body utilizing the anatomically correct dolls and he was easily able to name all parts including the private part area. We then discussed good and bad touches. I asked if anyone had given him a bad touch and he said no. I asked if he had touched anyone else and he said no.... I then told Larry that he should tell his parents if someone touches his private part area and he agreed....

Senegel also met with Marcus during this visit:

[Marcus] proceeded to tell me that Larry was put out of school for touching someone in the "butt" and he said that he does it all the time....

The next day, June 11, Sebek met separately with Guez and Senegel. Sebek expressed concern that someone was sexually abusing Larry, and she recounted a list of possible suspects, including some of Metzger's neighbors. She did not list Metzger among the people she thought might be responsible. When discussing the same subject with Senegel, she again mentioned Metzger's neighbors, but not Metzger.

Either on June 16 or 17, Guez evaluated Larry. Guez testified that her first evaluation of Larry was on June 17; her notes also indicate that June 17 was the first date. Senegel, however, testifying from a copy of her handwritten notes, stated that she called Guez on June 16, and that Guez told Senegal that she (Guez) had evaluated Larry and suspected that he had been abused. She testified that she had not seen her original handwritten notes, and that "[i]t's possible" that the date had been altered. She stated that "[t]he date could have been changed." Guez testified that she spoke to Senegal and reported her suspicion on June 17. Guez reported to Senegal that Larry was "troubled," and that he was possibly being sexually abused.

Guez stated that he evaluated Larry four times: on June 17 and 18, and on July 7 and 9. During this period, she obtained copies of Kugler's records, Brown's records, and Taylor's records. Guez' observations of Larry included the following:

Larry is acutely distressed.... His demeanor, affect, and behavior as well as the content of his play and projections suggest a strong likelihood of both physical and sexual abuse. The etiology of the abuse appears to be from a male figure and possibly a paternal figure.

Guez also stated that Larry's distress appears to relate to a history of sexual abuse, "most likely by his father."

From the stand, Guez explained some of the reasons for her conclusion that it was "most likely" Metzger who was sexually abusing Larry:

> [Larry] went over to a dollhouse and he removed the furniture from the room, and there's a group of family dolls that I have that go along with the dollhouse. He removed all of the furniture from one room, and he said: I'm scared to touch the daddy dolls. He took the daddy dolls and he put them behind his back and hid them and called them the daddy dolls.... He took two daddy dolls and he hid them behind his back.
>
> . . . . .
>
> Then he unclothed the little boy doll, hides it and starts smiling and becomes very secretive in his play with that doll. And then he looks at me ... and he points to the anus of the doll and he says: What's that? And he sort of smiles and appears to have a lot of anal interest at that point. He says: The chimney has smoke in it. This is daddy. He pulls out a daddy doll. He says: I have two daddies.... [T]hen he says he hurt him and the little boy with the two daddies, he's dead, and the mommy and the daddy are mad at each other, and the two daddies are together right now. He's got the two daddy dolls and the little boy doll in the middle, and he has the daddys [sic] back-to-front, and he says they're bad, real bad, and he bangs them against this little baby doll in the middle, and says they're having a spanking. That created some interest in me in sexual problems, fear of daddy, possibility of some type of abuse, be it physical, emotional or sexual with father figures.

Guez' conclusions included the following:

> [T]here is a strong likelihood of both physical and sexual abuse suggested by [Larry's] behavior. The etiology of the abuse appears to be from a male figure and possibly a paternal figure.... A male figure and possibly a paternal figure was suggested to me by this boy's play, and specific references to his fear of daddy dolls and his preoccupation with being hurt

and scared around daddy, wanting to run away from daddy's house.

Guez' notes and her testimony both reflect that Larry had said that he had two "daddies." Guez did not know to whom Larry was referring when he spoke of the second "daddy."

On June 26, Senegal asked Guez to serve as "case monitor" and to "inform us if abuse is disclosed." On June 30, Senegal noted in the CPS file on the case that "[a]t this time, the investigation is incomplete. Therefore, findings will be delayed until we are able to reinterview Larry for possible sexual abuse."

On or about July 2, HPD "cleared" the case against Metzger "as unfounded," noting that Larry himself had never stated that he had been abused. Anderson stated that there was "some evidence" to go forward with the case, but that there was just not enough evidence, particularly without a statement from Larry.[3] The report mentions that Sebek "suspects the father's friends" of abusing Larry, "as the father is gay."

On July 6, Guez evaluated Metzger. Her reports states that "[t]here is a preoccupation with sexuality which suggests a cloaked or latent polymorphous perverse orientation to the environment. His fantasies may include latent homosexual, bisexual, and exhibitionist feelings ... [T]he data suggest that ... his rigid defensive stance belies emotional dysfunction particularly in the arena of interpersonal relations and sexuality."

On the morning of July 7, Sebek noticed that Larry was lying on the floor not wearing any underwear. Sebek testified about the incident as follows:

> [H]e was playing with himself. And he was sort of in a traum—he was in a daze. And I said, Larry, and he was kind of straunched [sic] up on the floor. What are you doing. And he said I am playing with my privates. Jerking them up and down. I said has anybody ever done that with you. He said yes. And I said who. And trying to be calm about this whole thing. He said daddy. And I said, well, does he

---

**3.** When asked what the term "unfounded" meant as used in the report, Anderson testified: "There was no—there was not enough evidence at that time to substantiate an offense."

do anything else with you. And he said he ties his feet.

. . . .

And he said other things about his daddy riding his back, calling him horsey and names and so it was—I assured him that he had done nothing wrong, that everything was going to be okay. And we talked a little bit about saying no, being firm and I called Dr. Guez and asked her what I should do with him. . . . [S]he recommended I take him out of the situation, the home and take him in another environment and that I had done the right thing by staying calm.

That afternoon, Metzger picked up Larry to attend an appointment they had with Guez. Pursuant to the court's temporary orders, Larry was to spend that night (and the night of July 9) with Metzger. While Metzger and Larry were with Guez, Sebek drove to Metzger's home to talk to Larry's baby-sitter. Because Sebek knew she had to leave Larry with Metzger that night, she asked the sitter to spend the night in Larry's room with Larry. Sebek told the sitter that she was concerned because Larry had been having "horrible nightmares"; the sitter promised Sebek that she would watch over Larry.

On July 9, Sebek reported Larry's statements to Senegal. She told Senegal she wanted to "file charges" against Metzger. Senegal scheduled an interview for Sebek and Larry for the next day, July 10.

In the interview, Senegal used anatomically correct dolls to question Larry. The following occurred (in Senegal's words):

Larry had a blue bicycle chain with him. . . . We again talked of touching, in terms of good touches and bad touches and I asked if anyone had given him a bad touch and he said yes, his father did. I asked how many times it happened and he said many times. I asked in which part of the house and he said the bedroom. . . . I then asked Larry to indicate with the dolls and he undressed the male doll and touched his private part area by moving it up and down. I then asked Larry about the bicycle chain and he said he and his father play with it. I asked him to show

me and he tied the chain around his arms and also put it over his head and around his waist.

After interviewing Larry, Senegal recommended to Sebek that Metzger have no overnight visitation "because of the abuse." Senegal also recommended that Metzger's visits with Larry all be supervised.

Later that day, Senegal, Sebek, and Larry went to Anderson's office. Sebek gave a statement to Anderson about what Larry had said, and Senegal videotaped an interview with Larry for Anderson to view.

We have viewed the videotape. During its making, Larry fidgets constantly, sometimes standing on his head, sometimes sitting in the interviewer's lap, sometimes lying down, and sometimes moving around on his feet. We note the following occurrences, set out in chronological order, on the videotape:

* Larry correctly identifies the name of his "dad" as Mark.

* Larry has difficulty with the concepts of truth and lying:

Interviewer: Larry, do you know what a lie is?

Larry: Yeah.

Interviewer: Yeah. What is a lie?

Larry: I don't know.

Interviewer: Okay. Do you know if it's good or bad to tell a lie?

Larry: No.

Interviewer: No? You don't? Is it good to tell a lie?

Larry: Yeah.

Interviewer: Is it good to tell the truth?

Larry: Yes.

Interviewer: Okay, is it good, is it bad to tell a lie?

Larry: Yes.

Interviewer: Okay. Do you know what happens when you tell a lie?

Larry: Yeah.

Interviewer: What happens?

Larry: I don't know.

* Larry can correctly identify a person's "bottom" and "private parts" on anatomically correct dolls.

* Larry denies several times that "anyone" has touched his private parts. After the last denial, however, he volunteers that "somebody did." The following exchange then takes place:

> Interviewer: Somebody did? Who did?
>
> Larry: I don't know.
>
> Interviewer: You don't know?
>
> Larry: (inaudible)
>
> Interviewer: You do know? Who did?
>
> Larry: Daddy.
>
> Interviewer: Okay. What did he touch you with there?
>
> Larry: I don't know.
>
> Interviewer: You don't know. Did he touch you a lot of time or a little bit of times?
>
> Larry: A little bit of times.
>
> Interviewer: Little bit of time?
>
> Larry: Yeah.
>
> Interviewer: Did he touch you in the living room or the bedroom?
>
> Larry: Bedroom.

* Later, Larry again correctly identifies his "daddy's name" as Mark:

> Interviewer: What's your daddy's name, Larry?
>
> Larry: Mark.

* The interviewer later asks Larry where "Mark" touched him, and Larry indicates the doll's crotch several times. After the last indication, Larry very visibly wets his pants.

* At the end of the interview, the interviewer questions Larry about the truthfulness of what he has said in the interview:

> Interviewer: Now, everything you told me today, is it the truth or is it a lie? Are you telling me the truth?
>
> Larry: A lie.
>
> Interviewer: Huh?
>
> Larry: A lie.
>
> Interviewer: No? It's a lie?
>
> Larry: Yeah.

Based on what she had heard and seen, Anderson decided to "reopen" the case against Metzger. The report notes that the case is "to continue pending presentation to the DA's office."

In a report dated July 13, Guez reported to the court concerning Larry's situation. Guez wrote:

> [T]here is ample reason for alarm in regard to the psychological well being of these children and in particular . . . Larry. Different from the acute distress which the children are experiencing relative to the current litigation and hostility between these two parents, there is a chronic history of trauma, possible abuse both physical and sexual. . . . Larry exhibits severe signs of depression, self-abuse, uncontrolled acting-out and aggression and a general paucity of either ego controls or nurturing. The deficits in this little boy are so great as to certainly warrant intense psychological intervention, even on an inpatient status. Larry's distress appears to relate to a history of both sexually and physically abuse [sic] most likely by his father. The abuse . . . [appears to be] more in line with fondling and exhibitionism.

Guez also wrote that neither Sebek or Metzger was capable of adequately caring for Larry: [4]

> These children have been raised in an environment where the father has taken an authoritarian, rigid, punitive role and where the mother has taken a passive-submissive and helpless role. Both extremes are to a fault and neither on its own can supply the psychological needs of these children. . . . In the first setting, they are more prone to be behaviorally controlled, but emotionally damaged and in the latter setting they are more likely to be behaviorally out of control, but more emotionally supported. The lack of a core identity in Mrs. Metzger keeps her from being able to provide direction either for herself or for her children and she will need a massive dose of parenting skills and

---

4. Guez repeated her evaluation in live testimony: "I think that's the gist of my report, that neither one of these parents could care for this child."

support in order to provide an appropriate environment in which these children can thrive. Mr. Metzger's interpersonal and sexual problem and reliance upon authoritarian models of the family make him a poor candidate to be Managing Conservator of these children. That is not to say he should not be allowed father-son or father-daughter relationships with his children. But it is to say that overnight visitation is not recommended, at least for the younger two at this time....

It is recommended that if Mrs. Metzger can get herself psychological support and education on parenting that she be given sole Managing Conservatorship and that Mr. Metzger be allowed a status of PC under limited circumstances....

At trial, Guez elaborated on Metzger's "sexual problem" (the term she used in her report). She testified that Metzger had "difficulties in gender identity, in sexual expression, and in fantasy associated with sexual issues."

On July 14, Sebek's attorneys, Lilly and Nass, moved for a temporary restraining order, seeking to stop Metzger from exercising his visitation rights with his children. The motion was based on Guez' report (a copy of which Nass had previously obtained) and information obtained from Sebek, Taylor, and the School, and was supported by affidavit. The certificate of service on the motion indicates that a copy of the motion was hand-delivered to Raborn.

At the hearing on July 14, the court granted an ex parte temporary restraining order prohibiting Metzger's access to his children. The court set a hearing for July 17.

Later on July 14, Guez called Senegal and told her that she had filed a report with the court in which she stated her suspicion that Metzger was sexually abusing Larry. Guez also told Senegal that she believed Larry should be hospitalized.

The next day, July 15, Senegal called Metzger to schedule an office visit for them to discuss the allegations of sexual abuse. Metzger said he needed to discuss the matter with his attorney and would call Senegal the next day. When Metzger called the next day, he informed Senegal that his attorney advised that he should have no contact with her until after the hearing on July 17.

On July 17, the judge met with Lilly, Nass, Raborn, Senegal, and Guez. Lilly, Raborn, and Guez all testified regarding what occurred in the conference. Their testimony is substantially the same and reflects the following: Guez paraphrased the contents of her report, and stated that, in her opinion, Larry had been sexually abused, by a male, while in the care and custody of his father. She stated that neither Metzger or Sebek was currently able to adequately care for Larry, and that she wanted to place Larry in Depelchin Children's Center (Depelchin) because she feared for Larry's safety, physical and psychological. Although nothing was specifically voiced by Guez or Senegal, both Raborn and Lilly understood that, if they would not accept Guez' recommendation that Larry be hospitalized, CPS, with the support of Guez, would attempt to intervene in the lawsuit and seek Larry's hospitalization.

Raborn found Guez "articulate," "persuasive," "professional," and "credible." She believed that the judge would accept Guez' recommendations and put Larry in Depelchin "based upon his view of the best interest of Larry Metzger." She therefore advised Metzger, after the conference, to settle the case "and try to work something out with regard to [Depelchin] so that he could maximize the amount of time that he would have with the children." Raborn advised Metzger that, if he agreed to having Larry put in Depelchin, "he might have a little control over" the conditions of Larry's hospitalization, i.e., his visitation rights there. She advised him that if he did not agree to hospitalization, the court would probably do it anyway, and he would then probably have much less say in visitation.

When Guez left the conference, she encountered Metzger outside the conference room. She told him that his children, and particularly Larry, were not safe, and that they needed to be in "some type of protective setting," either "a hospital [or] foster care."

On July 20, the judge, Metzger, Raborn, Sebek, and Lilly signed an agreed divorce

decree. The decree included the following terms:

* Sebek is appointed managing conservator of the children.
* Metzger is appointed possessory conservator.
* Larry is to be placed in Depelchin for 30 days, the cost to be borne primarily by Sebek.
* Sebek shall enter therapy with Guez "as pertains to the parent-child" relationship.
* "As a condition of possession of and access to the minor children," Metzger shall enter therapy with Dr. Blair Justice, or, if Dr. Justice is unable to serve as Metzger's therapist, with "a substitute psychologist or psychiatrist as recommended by Dr. Jean Guez."

Guez was to be "the liaison [ ] between the treating professionals and the legal professionals to determine the best interest" of Larry after the divorce.

Sebek enrolled Larry at Depelchin on July 21. She signed a consent form which stated that Larry "will receive ... accepted psychiatric treatment and normal medical treatment by the staff" while he is a patient. She also was presented with (among other forms) a form entitled "Movie Permission," which stated as follows:

Sometimes during a patient's stay with [Depelchin], movies with ratings of PG 13 and R are shown specifically for therapeutic content. These movies are always previewed and approved by the treatment team. After viewing, the content is utilized for group dynamic processing.

May we have your permission to allow your child to view these movies with the group, if shown?

___Yes

___No

Sebek checked "Yes" and signed the form.

Larry was admitted to a 10–to–12 bed unit of Depelchin. His treatment team consisted mainly of Dr. Ernest Kendrick, Dr. Luisa Lohner, and Dr. Ann Hodges (all of whom we will refer to by their respective last names). Dr. Kendrick, from Baylor College of Medicine (Baylor), was the head of the team.

Larry was evaluated shortly after being admitted. Kendrick opined that Larry "had a variety of behaviors that were unusual, abnormal, and for a child his age ... dysfunctional for him." Under "Findings," Larry's psychiatric evaluation form lists seven disorders with the notation "R/O," for "rule out," before the disorders.[5] Guez informed Metzger of the "rule outs." Metzger understood that the "rule outs" were disorders that the evaluating physician had already concluded were *not* present in Larry; in other words, that these seven disorders had been "ruled out" as possible problems. Metzger reasoned that, because these seven disorders had been, in his mind, eliminated, the staff at Depelchin had concluded that Larry had not been sexually abused.

Actually, however, according to Kendrick, "rule out" means just the opposite:

[R]ule out does not mean that any particular event is eliminated as a possibility.... It actually means just the contrary, that that's part of the differential diagnosis and we are interested to see if those particular things might be what's going on with the patient.... The significance of it is to communicate to other people who are— who may be involved in reviewing the patient's treatment what it is you are thinking about as possibilities that may be the ideology or at least maybe the—what's going on with the patient diagnostically, because that often will indicate treatment.

The other health care professionals who testified regarding the meaning and significance of "rule out" gave it the same meaning and significance as Kendrick.

Upon receiving news of the "rule outs," Metzger called Senegal. He requested a meeting with Senegal and her supervisor. Metzger told Senegal that his "rights had been violated"; that Larry's psychiatric evaluation had "ruled out" sexual abuse; that he and Senegal had been "manipulated and used

---

5. The disorders are "undifferentiated attention deficit disorder," "conduct disorder," "oppositional defiant disorder," "dysthymia primary type," "post-traumatic stress disorder," "dream anxiety disorder," and "adjustment disorder with mixed disturbance of emotions and conduct."

by the system"; and that he had not abused Larry.

Senegal and Metzger arranged to meet the next day. Metzger, however, called the next day and cancelled the meeting, because "something had come up."

Dr. Justice was not available to counsel Metzger; therefore, pursuant to the divorce decree, another doctor had to be secured for that purpose. Metzger asked Kendrick for a recommendation, and Kendrick endorsed Dr. Michael Cox (Cox). Guez approved this choice, and Metzger contacted Cox immediately to begin therapy.

The first month or so of Larry's stay at Depelchin was marked by problems, including the following:

* Larry was often physically aggressive and confrontational with other children. Some of these episodes ended with the other child striking back against Larry and subduing him.

* Larry often struck staff members.

* Larry went to the bathroom in his pants several times, on one occasion smearing excrement on the walls and floor.

* Larry used bad language (words such as "f___" and "a____e") on numerous occasions, cursing the staff and other children;

* Larry stated that two older female children come into his room at night and touch his penis. He then recanted, twice stating that the girls did not do anything.

* Larry often played with his privates, and was noted to "act out sexually." On one occasion, he was noted lying on his stomach with his pants and underwear down. He had "stuck a little toy car up between his buttocks." When asked about the incident, Larry said he had put the car in his "butt" because, "If I didn't do that, something would get me." When asked who told him that, Larry replied, "my daddy."

On August 11, Metzger visited Larry during a "play therapy session." He did not see Larry again until September.

On August 21, upon Larry's having completed one month's stay in Depelchin, Kendrick, Taylor, Guez, Lohner, and Senegal met to discuss Larry's case. Larry's diagnosis was "post-traumatic symptoms due to sexual abuse, possibly by Mr. Metzger, as well as possible physical abuse." Another note stated that "[a]t present there are still questions about both parents' capacity to parent; however, Ms. Metzger is the least detrimental." The following plan was also reported:

Larry will remain hospitalized for an additional 30 days and Mr. Metzger's visitations will remain the same. Larry can be released to Ms. Metzger once her ability to protect increases and this will be based on three criteria:

a. Her plans for day-care.

b. Her increased parenting skills and therapy for she and Larry.

c. Ms. Metzger's commitment to long-term treatment for Larry.

The report from the August 21 meeting concludes with this note: "The card Mr. Metzger had given to Larry was also disclosed and it displayed two gorillas, one on top of the other one, which was determined inappropriate."

Anderson presented HPD's file on the case to Marie Munier (Munier), Chief of the Child Abuse Unit of the District Attorney's Office, who decided to go forward. Child Abuse Unit personnel contacted those appellees who had records on Larry and subpoenaed their records. None of the appellees initiated contact with the District Attorney's Office or volunteered information.

By September 17, Larry had achieved some progress. Kendrick reported that Larry no longer used the bathroom in his pants or wet his bed.

On September 25, Munier spoke by telephone to Cox. Cox agreed that someone had been abusing Larry, but pointed out that Larry had called other adult males besides Metzger "daddy." Munier thus decided that, in order to ascertain whether Larry actually meant Metzger when he had implicated, on previous occasions, "daddy" in his sexual abuse, Larry should view a photospread and be asked to identify who had abused him. Munier asked Anderson to arrange a photospread that included pictures of Metzger, Sebek's boyfriend (whom Metzger had identified as a possible perpetrator), and others.

Anderson went to Depelchin and showed Larry the photospread. Larry picked out Metzger's picture.

On October 2, Senegal called Kendrick about Larry's progress. Kendrick related that Larry had regressed within the last 10 days and had started soiling his pants again. Kendrick also noted that Larry's play "is also regressing to sexual connotations again." He also reported that Metzger had visited Larry twice a week lately, and opined that Larry's regression "has a direct association to Mr. Metzger's re-entry into Larry's life." Kendrick projected that Larry would need to remain in Depelchin for another 30 days. He expressed reservation regarding whether either of Larry's parents could adequately care for him.

On October 27, Munier presented the case regarding Metzger to a grand jury. She presented both the evidence that tended to incriminate Metzger in the sexual abuse of his son, and the evidence that tended to exculpate him.

Cox was the only witness to testify. Excerpts of his testimony include the following:

* "I have no evidence from the standpoint of psychological test that would leave [sic] me to believe he is a sex offender."

* "I don't believe [Metzger] ever touched this child for his own sexual gratification."

* "If I was blind and said, 'Give me this stuff and the test results on this. Is this guy likely to offend?' I would say 'no.'"

Later in Cox' testimony, Munier confronted him with the fact that Larry had picked Metzger out of a photospread. She asked Cox, "Does that change your opinion now?" He replied:

[I]f the interview and picture session were a valid one ... I assume it was a valid interview and I assume that Larry validly indicated Mark and to me, yeah, that is the most significant data point.

The grand jury indicted Metzger for sexual indecency with a child. The charges were dismissed, however, on the district attorney's motion, made after the trial court ruled that Larry was incompetent to testify.

On November 11, Depelchin discharged Larry. In the "closing summary," Kendrick wrote:

Although Larry made significant progress while in therapy, he needs to continue with outpatient care to decrease his depression and self-abusive behaviors, increase his trust in adults, increase his ability to protect himself by enlisting the aid of significant others, and reduce his aggressive behaviors. His parents need to continue in therapy to increase their parent management skills and improve their abilities in protecting and communicating with Larry.

On July 25, 1988, Guez issued her final report to Raborn and Lilly. She observed that "Larry is doing remarkably well"; that "Mark and Judy Metzger have made measurable progress in regard to their own therapy and parenting skills," but also that "[b]oth ... continue to have a higher priority attached to their own needs than to the children's...."; and that "[i]n regard to visitation issues, it is imperative that the status quo be maintained.[6] Night terrors and bed-wetting continue to occur after visitations with Mr. Metzger and increased time or unsupervised time is not considered to be in the best interest of the children."

On July 13, 1989, Metzger filed suit in federal court against the appellees and others, since dismissed. On August 16, 1990, the federal court dismissed Metzger's case on the ground that "the Court abstains from exercising jurisdiction even if, arguably, that jurisdiction exists." Metzger then brought suit in state court.

At the time of trial, Metzger's petition asserted the following causes of action:

1. civil conspiracy "for the unlawful purpose of maliciously, and without probable cause, bringing a criminal prosecution against Plaintiff for allegedly having sexually abused" Larry;

2. civil conspiracy "to [extort from and] defraud Plaintiff of valuable property and liberty interests, protectable under both the Texas and United States Constitutions";

3. malicious prosecution;

---

6. Metzger's visits with Larry were to be "100% supervised."

4. "deprivation of civil rights based upon malicious prosecution";

5. intentional infliction of emotional distress;

6. medical negligence for "negligently misdiagnos[ing] Larry as having been physically and sexually abused by Plaintiff" (asserted only against Depelchin, Baylor, Kendrick, Lohner, Cox, and Taylor);

7. negligent infliction of emotional distress (asserted only against Depelchin, Baylor, Kendrick, Lohner, Cox, and Taylor); and

8. civil RICO (Racketeer Influenced and Corrupt Organizations Act) [7].

After hearing Metzger's evidence, the trial court granted a directed verdict for all appellees on all applicable causes of action; the court did not state the specific ground or grounds on which it granted the motion. The court then sanctioned Metzger and his trial attorneys, L.T. "Butch" Bradt (Bradt) and Joe Alfred Izen, Jr. (Izen).

## II. A Fair Trial Before An Unbiased Judge

The appellants contend that the trial court denied them "a fair and impartial trial," and did not act as an unbiased court. They complain that the court "disparag[ed]" counsel "both in and out of the presence of the jury," and that the court "accus[ed] counsel ... of lying to the court and jury." This includes Metzger's sixth point of error, Bradt's tenth, eleventh, and twelfth points of error, and Izen's eleventh, twelfth, and thirteenth points of error.

We note initially that, because the judge removed this case from the jury—and thus the jury did not decide anything—Metzger could not have been harmed by the jury perceiving from his attorneys' conflicts with the judge that the judge was against him, if indeed the jury did so perceive. We also note that the judge never accused counsel of lying. On three occasions, he admonished Metzger's counsel not to mislead, each time with some reason:

1. Outside the presence of the jury, the judge told Izen that he had misled the

court, asked him why he did it, and instructed him not to do it again. Izen had stated that Guez suspected other people besides Metzger of abusing Larry, when Guez had actually said that Sebek had told her that she, Sebek, suspected other people of the abuse.

2. While questioning his witness, Izen referred to a medical report as being written by Taylor, when in fact the witness he was examining at the time had just testified that she herself had written the report. Defense counsel objected to the question, pointing out that the report had not been written by Taylor. The judge sustained the objection, and then told Izen, "don't mislead me anymore."

3. When Izen was cross-examining Lilly, Lilly testified four times that he had not seen a videotape before trial. Izen then asked him whether he remembered what was on the videotape. After an objection by defense counsel, the judge told Izen to "think again" if he thought he was going to mislead the lawyers, the judge, and the jurors, and told him that he had tried to "misrepresent evidence."

The propriety of the judge's comments will be discussed below. With these preliminary observations, we turn to our analysis of the appellants' complaint.

### 1. The substance of the parties' right

▌ The parties have a right to a fair trial under both the United States Constitution and the Texas Constitution. *See In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (holding that "[a] fair trial in a fair tribunal is a basic requirement of due process"); *Babcock v. Northwest Memorial Hosp.*, 767 S.W.2d 705, 708 (Tex.1989) (holding that, "[i]n Texas, the right to a fair and impartial trial is guaranteed by the Constitution"). In Texas, part of the right to a fair and impartial trial is also secured by statute. *See* TEX.GOV'T CODE ANN. § 62.105 (Vernon 1988).

▌ One of the most fundamental components of a fair trial is "a neutral and detached judge." *Ward v. Village of Monroe-*

7. 18 U.S.C. §§ 1961–1968 (1991 & Supp.1994).

*ville,* 409 U.S. 57, 62, 93 S.Ct. 80, 84, 34 L.Ed.2d 267 (1972). A judge should be fair and impartial and not act as an advocate for any party. *Delaporte v. Preston Square, Inc.,* 680 S.W.2d 561, 563 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). A judge should not be any party's adversary. *Ex parte Finn,* 615 S.W.2d 293, 296 (Tex.Civ.App.—Dallas 1981, no writ); *see Delaporte,* 680 S.W.2d at 563. The impartiality of the judge is not only a matter of constitutional law, but of public policy, as well:

> Public policy demands that a judge who tries a case act with absolute impartiality. It further demands that a judge appear to be impartial so that no doubts or suspicions exist as to the fairness or the integrity of the court. Judicial decisions rendered under circumstances that suggest bias, prejudice or favoritism undermine the integrity of the courts, breed skepticism and mistrust, and thwart the principles on which the judicial system is based.

*CNA Ins. Co. v. Scheffey,* 828 S.W.2d 785, 792 (Tex.App.—Texarkana 1992, writ denied) (citations omitted).

■ Every trial court has the "inherent power" to control the disposition of the cases on its docket "with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North Am. Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936). "How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Id.* at 299 U.S. at 254–55, 57 S.Ct. at 166.

In Texas, a trial court's exercise of its "inherent power" is partially promoted by, and partially guided by, the Texas Rules of Civil Procedure, which "provide a trial judge with the tools to facilitate the litigation of lawsuits and, to a certain extent, to prevent abuse of the legal process." *Waguespack v. Halipoto,* 633 S.W.2d 628, 629 (Tex.App.—Houston [1st Dist.] 1982, writ dism'd w.o.j.). Together, the court's "inherent power" and the applicable rules of procedure and evidence accord judges broad, but not unfettered, discretion in handling trials. *See Texas Employers Ins. Ass'n v. Loesch,* 538 S.W.2d 435, 440 (Tex.Civ.App.—Waco 1976, writ ref'd n.r.e.) (holding that court may

place some limits on voir dire examination); Tex.R.Civ.P. 270 (allowing the court the discretion to permit "additional evidence" to be offered); Tex.R.Civ.P. 286 (stating that "[a]dditional argument may be allowed in the discretion of the court" in the event that the jury receives further instructions after having retired); Tex.R.Civ.Evid. 611(a) (giving the court "reasonable control" over the interrogation of witnesses and presentation of evidence).

## 2. The obligations of the judge and attorneys

■ The judge is responsible for the general conduct and management of the trial. *Pitt v. Bradford Farms,* 843 S.W.2d 705, 706 (Tex.App.—Corpus Christi 1992, no writ); *Food Source, Inc. v. Zurich Ins. Co.,* 751 S.W.2d 596, 600 (Tex.App.—Dallas 1988, writ denied); *French v. Brodsky,* 521 S.W.2d 670, 679 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.). In fulfilling this responsibility, the court has discretion·in expressing itself while managing the trial. *Pitt,* 843 S.W.2d at 706; *Food Source,* 751 S.W.2d at 600; *Texas Employers Ins. Ass'n v. Draper,* 658 S.W.2d 202, 209 (Tex.App.—Houston [1st Dist.] 1983, no writ); *Best Inv. Co. v. Hernandez,* 479 S.W.2d 759, 761 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.). The judge may properly intervene in the proceedings to maintain control and promote expedition. *Food Source,* 751 S.W.2d at 600; *French,* 521 S.W.2d at 679. The judge should, however, refrain from verbally confronting or displaying displeasure toward counsel, particularly in the presence of the jury. *Pitt,* 843 S.W.2d at 706; *Food Source,* 751 S.W.2d at 600; *French,* 521 S.W.2d at 679. During trial, the judge should not make unnecessary comments or remarks that may result in prejudice to a litigant. *Brown v. Russell,* 703 S.W.2d 843, 847 (Tex.App.—Fort Worth 1986, no writ); *Crawford Chevrolet, Inc. v. McLarty,* 519 S.W.2d 656, 664 (Tex.Civ. App.—Amarillo 1975, no writ).

■ "Lawyers [ ] have the responsibility to conduct themselves with respect for the tribunal and the legal system." *Shaw v. Greater Houston Transp. Co.,* 791 S.W.2d 204, 211 (Tex.App.—Corpus Christi 1990, no

writ). The lawyers (and parties) should not engage in behavior likely to invoke proper admonishment from the court. *See Pitt,* 843 S.W.2d at 707; *Draper,* 658 S.W.2d at 209.

### 3. The standard of review

█ To reverse a judgment on the ground of improper conduct or comments of the judge, we must find (1) that judicial impropriety was in fact committed, and (2) probable prejudice to the complaining party. *Pitt,* 843 S.W.2d at 706; *Brown,* 703 S.W.2d at 847; *see Food Source,* 751 S.W.2d at 600; Tex.R.App.P. 81(b). We examine the entire record to determine whether these factors are present. *Pitt,* 843 S.W.2d at 706–707; *Brown,* 703 S.W.2d at 847.

### 4. Analysis and resolution

█ The statement of facts in this case is over 4400 pages long. We have read it in its entirety, including all of the many episodes where the judge and one or both of Metzger's trial attorneys had any sort of interaction. The appellants complain of over 150 of these episodes.

The great majority of the interactions between the judge and Metzger's attorneys was innocuous; many were just exchanges during which the judge disagreed with Metzger's attorneys on some point, such as when the judge would sustain an objection made by defense counsel. In some of these instances of disagreement, the disagreements became unpleasant, marked by perceptible sharpness on both sides. In other of these instances, the judge was abrupt, terse, or gruff with Metzger's attorneys. There is no doubt from this record that the judge sometimes lost his patience with them over the course of the proceedings, which lasted more than a month.

Nor is there any doubt that the judge's patience was sorely tested by the behavior—indeed, sometimes the antics—of Metzger's attorneys. The record reflects that, to a large degree, Metzger's attorneys invited the court's agitation and impatience by their behavior. For example, Metzger's attorneys repeatedly violated the order in limine; violated other orders of the court; interrupted the judge; grumbled audibly about rulings;

laughed at the judge; misread documents; and attempted to mislead the judge and some witnesses. Metzger's attorneys often earned the impatience and intolerance sometimes shown them by the judge.

In several encounters, the remarks of the judge may indeed have created an impression in the minds of the jurors that the judge was impatient, agitated, and angry at the behavior of Metzger's counsel. This is regrettable. However, as noted, counsel contributed to a very large degree to the state of mind that produced the judge's sometimes sharp rebukes. We find no evidence, however, that the judge's impatience was anything more than that, and no evidence of bias against Metzger or his attorneys. The judge's agitation did not lead to partiality. Nor did the judge become an advocate. The record indicates that the judge's comments were mainly directed to the often disorderly process of the trial—a process over which the law makes him responsible.

For us to set out and analyze in this opinion each episode of conflict cited by the appellants would benefit no one. *See Best Investment,* 479 S.W.2d at 761 (where appellant complained of judge's statements that allegedly embarrassed counsel and that allegedly showed the judge had become an advocate for the other side, court of appeals, in overruling point, declined to set out the various remarks complained of, stating that "[i]t would serve no useful purpose" and that the court "ha[s] carefully read and considered same and are of the opinion that none of them or all of them taken together constitute error"); *see also Glasser v. United States,* 315 U.S. 60, 83, 62 S.Ct. 457, 471, 86 L.Ed. 680 (1942) (Court declined to separately consider "numerous instances of alleged prejudicial misconduct" because to do so "would unduly extend this opinion," and held "after due consideration" that there was no reversible error). It would needlessly lengthen an already long opinion, be of no aid to the parties and their attorneys, and provide no significant guidance to the bench and bar.

We hold that Metzger has not shown the prejudice required for us to reverse and remand on this ground. *See Pitt,* 843 S.W.2d

at 706; *Brown,* 703 S.W.2d at 847. As noted, the jury did not decide this case, so any prejudice against Metzger that the encounters between the judge and Metzger's attorneys may have produced in the minds of the jurors is irrelevant.

Indeed, there is authority that the jury's not deciding this case makes the appellants' complaint about the judge moot. *See Best Investment,* 479 S.W.2d at 761 (holding that "the point of error" based on the judge's allegedly improper remarks "seems to be moot since the case was withdrawn from the jury's consideration and judgment rendered by the court"). However, in at least one case, a court of appeals has reversed a judgment on this ground "[e]ven though many of the[ ] incidents occurred outside the presence of the jury," holding that *"the cumulative effect* of all of [the judge's] acts deprived appellants of a fair trial." *Shaw,* 791 S.W.2d at 211 (emphasis added).[8] Here, even considering the "cumulative effect" of all of the judge's comments, we cannot say that Metzger's right to a fair trial was compromised by the court's behavior. Those instances where the court showed less patience or decorum than it should have do not amount to reversible error.

■ Based on the above, we overrule Metzger's sixth point of error. We also overrule Bradt's tenth, eleventh, and twelfth points of error, and Izen's eleventh, twelfth, and thirteenth points of error, but for a different reason. The right to a fair trial before an impartial judge is the *litigant's* right, not the attorney's. Bradt and Izen do not have standing to complain of this alleged error. *See Gibson v. Richter,* 97 S.W.2d 351, 352 (Tex.Civ.App.—San Antonio 1936, no writ).

## III. The Directed Verdict

Metzger argues that the trial court erred in granting all of the defendants a directed verdict on all of his causes of action. This includes Metzger's third and seventh points of error.

■ Bradt and Izen also allude to the granting of the directed verdict as error. However, even if their discussions of the issue could be construed as valid argument under TEX.R.APP.P. 74(f)—an issue we do not decide—they still lack standing to complain of the alleged error. *See Gibson,* 97 S.W.2d at 352.

### 1. The standard of review

■ Where a trial court grants a motion for directed verdict without stating the specific ground or grounds on which it is relying, the verdict must be upheld if any of the grounds stated in the motion are meritorious. *McCarley v. Hopkins,* 687 S.W.2d 510, 512 (Tex.App.—Houston [1st Dist.] 1985, no writ). A directed verdict is proper if (1) a defect in the non-movant's pleadings makes them insufficient to support a judgment; (2) the evidence conclusively proves a fact that establishes the movant's right to judgment as a matter of law, or negates the right of the non-movant to judgment; or (3) the evidence is insufficient to raise a fact issue on the cause of action at issue. *Edlund v. Bounds,* 842 S.W.2d 719, 723–24 (Tex.App.—Dallas 1992, writ denied); *McCarley,* 687 S.W.2d at 512. The trial court should not weigh the credibility of the witnesses in determining whether a directed verdict is warranted. *Do v. Huber, Formagus, Holstead & Guidry Ins., Inc.,* 728 S.W.2d 852, 853 (Tex.App.—Beaumont 1987, no writ).

■ In reviewing a directed verdict, we consider all of the evidence in the light most favorable to the party against whom the verdict was directed, disregarding all contrary evidence and inferences. *Qantel Business Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 303 (Tex.1988); *Edlund,* 842 S.W.2d at

8. The appellants attempt to equate this case to *Shaw.* The two cases are not, however, comparable. In *Shaw,* the judge asked an attorney who she had just held in contempt to pay money to the judge's favorite charity—a friend of the judge who was in the hospital awaiting an operation. 791 S.W.2d at 211. The judge told one attorney to "shut up!" *Id.* The judge insulted one of the attorneys, openly questioning his competence; told one of the parties that she was sorry he had chosen the attorney who was representing him; left the bench during the trial; and brought her son, who was ill at the time, to court during the trial, which disrupted the proceedings. *Id.* The judge in this case did not come close to plumbing the depths of *Shaw* behavior.

723. We determine whether there is any evidence of probative force to raise a fact issue on the material question presented. *Edlund*, 842 S.W.2d at 723. If such evidence exists, it was error for the trial court to direct a verdict; the question should have been presented to the jury. *Id.* at 724.

### 2. Metzger's causes of action

#### A. Negligent infliction of emotional distress

 In Texas, there is no cause of action for negligent infliction of emotional distress. *Boyles v. Kerr*, 855 S.W.2d 593, 594 (Tex.1993). At the time of trial, however, this cause of action did exist. *See St. Elizabeth Hosp. v. Garrard*, 730 S.W.2d 649, 653–54 (Tex.1987). Nevertheless, because Metzger did not proceed solely on this theory at trial—having proceeded on seven other causes of action, as well—we apply the holding in *Boyles* and affirm the judgment for the defendants on negligent infliction of emotional distress. *See Boyles*, 855 S.W.2d at 594, 603 (where plaintiff failed to assert alternative causes of action perhaps because, under *Garrard*, this tort still existed, and thus proceeded only on this cause of action, court held that, although case had to be reversed because tort was abrogated, case was remanded for new trial for plaintiff to assert other possible theories of recovery). The abolishment of this tort in *Boyles* did not leave Metzger without a viable theory of recovery, as his pleading of seven other applicable causes of action shows. Therefore, unlike in Ms. Kerr's case, there is no need to remand so that Metzger can plead new theories in the place of this one, because he did not rely solely on this theory at trial.

We affirm the directed verdict regarding negligent infliction of emotional distress.

#### B. Medical malpractice

 Metzger pled medical malpractice against Depelchin, Baylor, Kendrick, Lohner, Cox, and Taylor, for "negligently misdiagnos[ing] Larry as having been physically and sexually abused by Plaintiff." However, "a mental health care professional owes no professional duty of care to a third party to not negligently misdiagnose a condition of a patient." *Bird v. W.C.W.*, 868 S.W.2d 767, 772 (Tex.1994). In *Bird*, the supreme court held that a summary judgment granted to a psychologist accused of negligently misdiagnosing a child as having been sexually abused by his father was proper, because the psychologist "owed no professional duty to the father to not negligently misdiagnose the condition of the child." *Id.* at 770.

*Bird* applies here. We affirm the directed verdict regarding medical malpractice.[9]

#### C. Malicious prosecution

 "Public policy requires that there be wide latitude in reporting facts to a prosecuting authority in order that the exposure of crime not be discouraged." *Compton v. Calabria*, 811 S.W.2d 945, 949 (Tex.App.—Dallas 1991, no writ). "Protection is [ ] afforded to one who makes a full and fair disclosure to the prosecuting attorney." *Ellis County State Bank v. Keever*, 888 S.W.2d 790, 794 (1994). The gravamen of a malicious prosecution action is that the defendant *improperly* made the plaintiff the subject of legal process to the plaintiff's detriment. *Browning–Ferris Indus., Inc. v. Zavaleta*, 827 S.W.2d 336, 338 (Tex.App.—Corpus Christi 1991, writ denied); *Daniels v. Conrad*, 331 S.W.2d 411, 415 (Tex.Civ.App.—Dallas 1959, writ ref'd n.r.e.) (quoting *Daughtry v. Blanket State Bank*, 60 S.W.2d 272, 273 (Tex.Civ. App.—Austin 1933, no writ)).

 At the time this case was tried, a plaintiff against whom criminal proceedings were instituted was required to establish seven facts to prove malicious prosecution: (1) the commencement of a criminal prosecution against the plaintiff; (2) that the prosecution was caused by the defendant or through its

---

**9.** The defendants did not cite *Bird* in moving for a directed verdict on this cause of action; it had not yet issued at the time of trial. They did, however, employ the rationale of *Bird* in their motion, relying on two cases that reached similar results before *Bird* was written, *Vineyard v. Kraft*, 828 S.W.2d 248 (Tex.App.—Houston [14th Dist.] 1992, writ denied), and *Dominguez v. Kelly*, 786 S.W.2d 749 (Tex.App.—El Paso 1990, writ denied).

aid or cooperation; (3) that the prosecution terminated in favor of the plaintiff; (4) that the plaintiff was innocent; (5) that there was no probable cause for the proceeding; (6) that the defendant acted with malice; and (7) damages. *Zavaleta,* 827 S.W.2d at 338; *Compton,* 811 S.W.2d at 949; *Thomas v. Cisneros,* 596 S.W.2d 313, 316 (Tex.Civ. App.—Austin 1980, writ ref'd n.r.e.); *Pete v. Metcalfe,* 8 F.3d 214, 219 (5th Cir.1993).[10] "One accused of malicious prosecution is rightly aided by 'an initial presumption that a defendant acted reasonably and in good faith and therefore had probable cause.'" *Keever,* 888 S.W.2d at 794 (quoting *Akin v. Dahl,* 661 S.W.2d 917, 920 (Tex.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984)).

The issue of whether probable cause existed does not turn on the guilt or innocence of the malicious prosecution plaintiff. *Fisher v. Beach,* 671 S.W.2d 63, 66 (Tex.App.—Dallas 1984, no writ); *Parker v. Dallas Hunting & Fishing Club,* 463 S.W.2d 496, 500 (Tex.Civ.App.—Dallas 1971, no writ); *Ledesma v. Dillard Dep't Stores, Inc.,* 818 F.Supp. 983, 986 (N.D.Tex.1993). Even an acquittal is not evidence of a lack of probable cause. *Fisher,* 671 S.W.2d at 66; *Parker,* 463 S.W.2d at 500; *Parkerson v. Carrouth,* 782 F.2d 1449, 1452 (8th Cir.1986); *Ledesma,* 818 F.Supp. at 986. Similarly, the dismissal of the criminal case before trial is not evidence of a lack of probable cause. *Ada Oil Co. v. Dillaberry,* 440 S.W.2d 902, 910 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ dism'd); *see Ledesma,* 818 F.Supp. at 986.

In their motion for directed verdict, the appellees advanced one ground for a directed verdict on the cause of action of malicious prosecution: the existence of probable cause. The record reveals that, during the proceedings, the trial court temporarily excused the jury and itself received the evidence on prob-

able cause. The trial court, in other words, was the finder of fact regarding probable cause.

While this procedure is unusual, the record reflects that it had the approval of all of the attorneys and the judge. Metzger attacks the procedure on appeal, arguing in his fourth point of error that the court erred "in ruling on ... probable cause for malicious prosecution," and that the court had thereby infringed on Metzger's "right to trial by jury."

Metzger is estopped from bringing the point. The record shows more than once that his counsel expressly agreed to try the issue of probable cause to the court, on one occasion even pointing out some of the benefits of proceeding in that fashion. A party cannot encourage the court to take a particular action and then complain on appeal that the court erred by taking it. *Austin Transp. Study Policy Advisory Comm. v. Sierra Club,* 843 S.W.2d 683, 689 (Tex.App.—Austin 1992, writ denied); *Dolenz v. American Gen. Fire & Casualty Co.,* 798 S.W.2d 862, 863 (Tex.App.—Dallas 1990, writ denied). We overrule Metzger's fourth point of error.

In the context of malicious prosecution, probable cause is "the existence of such facts and circumstances as would excite belief in the mind of a reasonable person, acting on facts within his knowledge, that the person charged was guilty of the crime for which he was prosecuted." *Compton,* 811 S.W.2d at 949–50; *see Zavaleta,* 827 S.W.2d at 345 n. 3. Thus, the question is not what the facts actually were, but rather what the defendant honestly and reasonably believed the facts to be. *Compton,* 811 S.W.2d at 950; *Green v. Meadows,* 517 S.W.2d 799, 810 (Tex. Civ.App.—Houston [1st Dist.] 1974) (quoting 54 C.J.S. *Malicious Prosecution* § 20 (1948)), *rev'd on other grounds,* 524 S.W.2d 509 (Tex. 1975).

---

**10.** Since the time of trial, the Supreme Court of Texas has decided *Browning–Ferris Indus., Inc. v. Lieck,* 881 S.W.2d 288 (1994). In *Lieck,* the court changed the second element listed above from that the prosecution was caused by the defendant or through its aid or cooperation to "whether [the defendant] either 'initiated' or 'procured' [the criminal proceedings], depending

on the nature of the case." 881 S.W.2d at 292. The court wrote that "[t]he Restatement concepts of initiation and procurement are better suited to malicious prosecution cases than the more general idea of causation." *Id.* The court limited the application of the new second element to "[malicious prosecution] cases in the future." *Id.*

The court, sitting as the trier of fact on this particular issue, found that there was probable cause in this case. This finding is supported by abundant evidence. As set out in the fact recitation above, Metzger was strongly implicated in the sexual abuse of Larry by (1) Guez, after observing and evaluating Larry; (2) Sebek, after speaking with Larry; and (3) Larry himself, who implicated him on several occasions. Each of these implications of Metzger—at least one of which was known to every appellee—independently constitutes "such facts and circumstances as would excite belief in the mind of a reasonable person, acting on facts within his knowledge, that the person charged was guilty of the crime for which he was prosecuted."

Because probable cause existed, the appellees were entitled to a directed verdict on Metzger's claim for malicious prosecution. *See Kroger Co. v. Hughes,* 616 S.W.2d 287, 288 (Tex.Civ.App.—Houston [1st Dist.] 1981, orig. proceeding) (holding that finding of probable cause was fatal to plaintiff's malicious prosecution action); *Lancaster & Love, Inc. v. Mueller Co.,* 310 S.W.2d 659, 662–63 (Tex.Civ.App.—Dallas 1958, writ ref'd) (holding that existence of probable cause defeated plaintiff's malicious prosecution action); *Adcox v. Safeway Stores, Inc.,* 512 F.Supp. 452, 453–54 (N.D.Tex.1980) (holding that "existence of probable cause is an absolute bar" to malicious prosecution action and awarding summary judgment to defendant). We affirm the directed verdict regarding malicious prosecution.

### D. "Deprivation of civil rights based upon malicious prosecution"

"There is a constitutional right to be free of 'bad faith prosecution.'" *Hand v. Gary,* 838 F.2d 1420, 1424 (5th Cir.1988). This right may be vindicated by bringing a civil rights claim. *Id.* at 1425, 1426; *Singleton v. City of New York,* 632 F.2d 185, 194–95 (2d Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981); *Bussard v. Neil,* 616 F.Supp. 854, 856

(M.D.Penn.1985).[11] Metzger thus brought his claim under 42 U.S.C. § 1983 (1986).

That there was no probable cause for the prosecution is an element of this cause of action. *Lee v. Mihalich,* 847 F.2d 66, 69–70 (3d Cir.1988); *Elbrader v. Blevins,* 757 F.Supp. 1174, 1179 (D.Kansas 1991); *Bussard,* 616 F.Supp. at 857. The inability to show a lack of probable cause is a "fatal defect" in a plaintiff's deprivation of civil rights case based upon malicious prosecution. *Bussard,* 616 F.Supp. at 857; *see Elbrader,* 757 F.Supp. at 1179. Facts that show the existence of probable cause and thus defeat a malicious prosecution claim also defeat a civil rights claim based on malicious prosecution. *Bussard,* 616 F.Supp. at 857.

In their motion for directed verdict, the appellees argued the existence of probable cause as the basis for a directed verdict on this cause of action. As noted, the court found probable cause, a finding supported by ample evidence. Because probable cause existed, the appellees were entitled to a directed verdict on this claim, as well. *See Bussard,* 616 F.Supp. at 857. We affirm the directed verdict regarding deprivation of civil rights by malicious prosecution.

### E. Conspiracy to maliciously prosecute

Metzger alleged the existence of a conspiracy "for the unlawful purpose of maliciously ... bringing a criminal prosecution against Plaintiff for allegedly having sexually abused" Larry.

A civil conspiracy is "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex. 1983). Thus, a plaintiff may allege that the object of the conspiracy is the commission of a tort—for example, to defraud him. *See Bernstein v. Portland Savings & Loan Ass'n,* 850 S.W.2d 694, 706 (Tex.App.—Corpus Christi 1993, writ denied). The tort is the "unlawful predicate act" of the conspiracy. *Id.* at 709. Disproving the "unlawful predicate act," however, does not automati-

---

**11.** The tort of malicious prosecution "rises to constitutional dimensions because it results in a

denial of due process." *Bussard,* 616 F.Supp. at 856.

cally disprove a conspiracy to commit that act. *See id.* at 709 n. 12.

■ The plaintiff in a civil conspiracy action must show the following elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Massey,* 652 S.W.2d at 934; *Bernstein,* 850 S.W.2d at 705. The "unlawful, overt acts" must be acts in furtherance of the conspiracy. *Massey,* 652 S.W.2d at 934.

■ In their motion for directed verdict, the defendants argued that they had committed no unlawful acts that led to Metzger's indictment, and that lawfully furnishing information to law enforcement officers is not an act for which they may be held liable. We agree with both assertions. The record does not reflect "one or more unlawful, overt acts" committed in furtherance of a scheme to have Metzger prosecuted. The absence of this element is fatal to Metzger's claim. *See Massey,* 652 S.W.2d at 934.

Metzger points out four occurrences that he argues are examples of the "conspiracy" in motion. First, Metzger notes that Depelchin *"ruled out* any abuse of Larry." (Emphasis in Metzger's brief.) As noted above, Larry was evaluated shortly after being admitted to Depelchin. Under "Findings," Larry's psychiatric evaluation form lists seven disorders with the notation "R/O," for "rule out," before the disorders. Guez informed Metzger of the "rule outs," and Metzger concluded—wrongly—that the "rule outs" were disorders that the evaluating physician had already decided were *not* present in Larry (i.e., that these seven disorders had been "ruled out" as possible problems). Metzger reasoned that, because these seven disorders had been, in his mind, disqualified, the staff at Depelchin had concluded that Larry had not been sexually abused.

As Kendrick testified, however, the term "rule out" has a meaning quite different than that attributed to it by Metzger. "Rule outs" are actually those problems *that may in fact be what is wrong with the patient,* and that therefore should be focused on, not consid-

ered ineligible. All of the health care professionals who testified about the meaning and significance of "rule out" agreed. This episode is not evidence of a conspiracy; it is evidence of a misunderstanding, and nothing more.

Metzger also states that Guez' conclusion "that Metzger engaged in fondling and exhibitionism with Larry was based on her interpretation of Metzger's response to card three of the Rorschach test!" This seems to imply that, when Guez evaluated Metzger, she based her conclusion that the abuse was "more in line with fondling and exhibitionism" *solely* on Metzger's response to a single card of the Rorschach test.

Metzger argues that it was improper to reach such a conclusion from a single response. We do not address this issue, because the record indicates that Guez' conclusion was not based solely on Metzger's response to card three or any other single response. This episode, in any event, is not evidence of a conspiracy.

Third, Metzger contends that Taylor and Guez "violat[ed][ ] the requirements of § 34.01 and 34.02, Family Code," by not making a "written report of abuse to CPS." It is undisputed that both reported their suspicions of abuse to CPS, albeit orally; Taylor testified she did not make her report in writing "because there was already a case opened and I had the name of the person there to talk with, so I just called her and talked to her."

We need not determine whether Taylor and Guez violated the Family Code; even presuming for the sake of (Metzger's) argument that they did, these are not unlawful acts *in furtherance of the conspiracy.* According to Metzger, the object of the conspiracy was to maliciously prosecute him; he makes no argument regarding how Taylor and Guez not reporting Larry's abuse in writing helped the alleged conspiracy toward that goal. Nor can we independently conceive how these specific acts furthered the alleged conspiracy, particularly when it is undisputed that both did, in fact, report to CPS, although orally. Ironically, part of Metzger's complaint is that people reported abuse in the first place; here, however, he

argues that the very reports he complains about should have been made in writing, which would have made them even more substantial than they were.

■ Furthermore, the wrongful act in a civil conspiracy claim must be done *to the plaintiff.* *American Computer Trust Leasing v. Jack Farrell Implement Co.,* 763 F.Supp. 1473, 1489 (D.Minn.1991), *aff'd and remanded, American Computer Trust Leasing v. Boerboom Int'l, Inc.,* 967 F.2d 1208 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 414, 121 L.Ed.2d 338. Here, if the lack of written reporting harmed anybody (and there is no evidence that it did), it would have been Larry that was harmed, not Metzger.

This circumstance does not constitute evidence of the alleged conspiracy.

Fourth, Metzger asserts that "the purported handwritten notes of Ann Hodges which bore out purported outcry evidence of sexual abuse by Metzger were, in actuality, forged by Jean Guez." Hodges testified that all the notes purportedly written by her, were, in fact, written by her. Metzger, however, outside the presence of the jury, produced a handwriting expert who stated that the notes were really written by Guez. The judge refused to allow the witness to testify before the jury, however, in part because her testimony violated a memorialized agreement between Metzger's counsel and the defendants' counsel that limited the scope of her testimony, and in part because her testimony was based on a document that had been altered.

■ Metzger does not offer any legal argument or authority regarding why the judge's exclusion of this evidence was erroneous; rather, he just concludes that "[t]he thought that a jury might conclude that forging of such documents became necessary so as to keep the lid on the conspiracy appeared to have evaded the judge." Metzger's failure to cite any authority to support this contention itself waives the contention. *New York Underwriters Ins. Co. v. State Farm Mut.*

*Auto. Ins. Co.,* 856 S.W.2d 194 (Tex.App.—Dallas 1993, no writ); *Clone Component Distribs. of Am., Inc. v. State,* 819 S.W.2d 593, 597 (Tex.App.—Dallas 1991, no writ); *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768, 810 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. dism'd,* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988); Tex. R.App.P. 74(f) ("The argument [in a brief] shall include: ... (2) such discussion of the ... authorities relied upon as may be requisite to maintain the point at issue."). The fact that he supports his contention with but a single, conclusory sentence is a separate, independent ground of waiver. *Anheuser–Busch Cos. v. Summit Coffee Co.,* 858 S.W.2d 928, 942 (Tex.App.—Dallas 1993, writ denied); Tex.R.App.P. 74(f)(2) ("The argument [in a brief] shall include: ... (2) such discussion of the facts ... as may be requisite to maintain the point at issue.").[12]

Metzger does not explain how the alleged forgery was needed to "keep the lid on the conspiracy," a good question considering there was an abundance of "outcry evidence of sexual abuse" aside from the Hodges notes. In any event, it appears that the judge was correct in excluding the evidence under the circumstances.

Furthermore, Metzger offers no argument regarding how the alleged forgery was in furtherance of the alleged conspiracy. From our review of this record, we cannot conceive how it was. Nor does Metzger allow how the alleged forgery harmed him, and again, from this record, we cannot say how it did.

This matter does not constitute evidence of the alleged conspiracy.

■ We are cognizant that, "[b]ecause of the secretive nature of conspiracies, courts allow plaintiffs to show conspiracy by circumstantial rather than direct evidence." *Bernstein,* 850 S.W.2d at 705. What Metzger offered on this claim, however, does not rise even to that level. We affirm the directed

---

**12.** In none of Metzger's complaints regarding the exclusion of evidence does he address the requirements necessary to obtain a reversal based on the evidence's exclusion. The appellant must show that (1) the trial court did in fact err in excluding the evidence, and (2) the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989).

verdict regarding conspiracy to maliciously prosecute.

### F. Conspiracy to defraud

Metzger pled the existence of a civil conspiracy "to [extort from and] defraud Plaintiff of valuable property and liberty interests, protectable under both the Texas and United States Constitutions." Under "Violation of Civil Rights," he complains that (1) the defendants denied him access to the courts by improperly "threat[ening]," at the July 17 conference, to place Larry in Depelchin; (2) the defendants "extort[ed] a 'settlement'" and forced the divorce decree upon him, thus "unconstitutionally interfer[ing] with Metzger's family relationship with his children"; and (3) "in forcing Metzger to undergo psychological testing and treatment under a psychologist who had to be approved by Guez, the defendants unconstitutionally interfered with another of Metzger's liberty and privacy interests: the decision to obtain or reject medical treatment."

We have grave reservations about the viability of these claims. *See Hamill v. Wright,* 870 F.2d 1032, 1037–38 (5th Cir.1989). The defendants argued in their motion for directed verdict, however, that, among other things not concerning the claims' viability to begin with, there was no evidence to support them. We agree.

█ There is no evidence that the defendants improperly "threatened" to put Larry in Depelchin at the July 17 conference; rather, a straightforward, accurate reading of the testimony about the conference shows it was understood that, if the attorneys would not accept the recommendation to hospitalize Larry, CPS, with the support of Guez, would attempt to intervene in the lawsuit and itself try to get Larry hospitalized. Under this

record, this is not actionable behavior, much less a denial of "access to the courts." The record reveals no more than CPS attempting to effect the hospitalization of a child whom the record shows was sorely in need of it.[13]

█ Nor is there evidence of the "extortion" of a settlement or that the defendants forced Metzger to sign the decree. The record demonstrates that Metzger, on the advice of his skilled and experienced counsel, decided to settle the case on less favorable terms than he would have liked due to considerable leverage on Sebek's side. This was not an "unconstitutional[] interfer[ence] with Metzger's family relationship with his children."

█ Nor did any defendant "forc[e] Metzger to undergo psychological testing and treatment under a psychologist who had to be approved by Guez." The record shows that Metzger, on the advice of his formidable counsel, accepted the terms of the decree, again in view of considerable leverage on the other side. This does not constitute interference with any of Metzger's rights.

Metzger points to the "disappearing motion" of January, 1987, as evidence to support his claim. As noted above, we find no such pleading in our record, or any pleading "infusing into the case child abuse allegations" in or around January, 1987.[14]

He also points to the discrepancy about when Guez first evaluated Larry. We see no difference whether the initial evaluation was on June 16 or June 17; it is undisputed that she did, in fact, evaluate him, and see him on several occasions. We acknowledge that either Guez' records, which state that Guez' first evaluation was on June 17, or Senegal's records, which state that she called Guez on June 16, and that Guez told her that she

---

13. We note that the right of access to the courts is the right to sue, which Metzger did—he brought the divorce action—but "not the right to win." *Alexander v. Macoubrie,* 982 F.2d 307, 308 (8th Cir.1992).

14. We do have in our record a certified copy of a proposed "Order Granting Social Study." The certified copy reflects Lilly's signature, and the District Clerk's office certifies on the back of the paper that it was filed on January 9, 1987. The certified copy of the proposed order, which does

not reflect the trial judge's signature, states that it is "ordered, adjudged and decreed that a social study be conducted of all parties by the Harris County Children's Protective Services and that their findings be promptly filed with this court...." This document states nothing about allegations of child abuse. Further, we know of no reason that Sebek should not have asked the court, even in January, 1987, to have CPS perform a social study.

(Guez) had evaluated Larry, are inaccurate regarding a date. The facts recorded in those records, however, are undisputed. Their irreconcilability regarding a date does not constitute evidence of conspiracy.[15]

What Metzger offered on this claim does not attain the status of even circumstantial evidence. We affirm the directed verdict regarding conspiracy to defraud.

## G. RICO

Under his RICO claim, Metzger pled that the defendants ran a "Child Abuse Enterprise." He alleged the following:

> The Child Abuse Enterprise consists of attorneys, social workers, health care professionals and the institutions that participate in child abuse and treating victims of such abuse.... It has as its purpose and function the acquisition of illegal income which it obtains from victims of false child abuse allegations, such as Mark Metzger, from insurance companies, from the State of Texas and from agencies of the federal government.

■■■■ A RICO plaintiff must have standing to sue pursuant to 18 U.S.C. § 1964(c) (1991). *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*, 868 F.2d 740, 742 (5th Cir.1989). Section 1964(c) gives standing only to a person "injured in his business or property by reason of [the alleged RICO violation]." 18 U.S.C. § 1964(c) (1991); *see Brandenburg v. Seidel*, 859 F.2d 1179, 1187 (4th Cir.1988). The quoted language requires the plaintiff not only to show that he has suffered injury to his business or property, but also to show that the injury was caused by the predicate acts of racketeering activity that make up the RICO violation. *Brandenburg*, 859 F.2d at 1187. In addition to meeting the requirement of standing, a plaintiff who desires to show a RICO violation must prove "(1) a *person* who engages in (2) *a pattern of racketeering activity* (3) connected to the acquisition, estab-

lishment, conduct, or control of an *enterprise*." *Ocean Energy II*, 868 F.2d at 742; *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir.1988), *cert. denied*, 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989).

■■■■ In their motion for directed verdict, the defendants argued that there is no evidence to support Metzger's civil RICO claim. For at least two reasons, we agree.

First, Metzger has not shown in this record that he was injured in his business or property by any predicate act of racketeering activity. In the section of his brief in which he discusses his RICO claim, he makes no mention of any evidence of this type of damages. Nor are we able to find any in the record. Without such evidence, Metzger cannot succeed on his RICO claim. *See Brandenburg*, 859 F.2d at 1187.

Second, "the RICO person must be one that either poses or has posed a continuous threat of engaging in acts of racketeering." *Delta Truck & Tractor*, 855 F.2d at 242. There is no evidence that these defendants pose or have posed a continuous threat to engage in racketeering acts. For example, the defendants who are mental health care professionals dealt with the evaluation and treatment of Larry. Even if they committed some fraudulent acts in this process—which we will assume for the sake of argument, but do not find in the record—that does not mean that they "posed a continuous threat [to] engag[e] in acts of racketeering." That does not qualify the course of Larry's treatment and evaluation as actionable *under RICO. See id.* at 243; *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 655 F.Supp. 1179, 1184 (S.D.N.Y.1987) ("[T]he RICO defendants in this case were engaged in a single lawful project of finite scope and duration.... Allegations of numerous instances of fraud in carrying out this project does not

---

15. We presume Metzger's theory—he does not articulate it—is that Guez had her mind made up on June 16 that she was going to report that Larry had been abused; that she therefore actually did tell Senegal on June 16 that she had evaluated Larry and concluded he had been sexually abused; and that the next day, she saw Larry and recorded her predetermined conclusion. Even if this is what occurred, it is not evidence of *conspiracy*, but rather of wrongdoing solely on the part of Guez. Nor does it mean that Larry was not, in fact, abused; the record is replete with evidence from others besides Guez that he was.

bring it within the scope of the RICO statute.").

Metzger argues that an attorney general's report concerning Depelchin billings that he admits are totally unrelated to Larry's stay there support his RICO claim. We disagree. The report concerns Depelchin's billing for treatment accorded 31 other patients. It was presented to a grand jury looking into Depelchin's billing practices, and the grand jury declined to indict Depelchin. This is not evidence of a RICO violation on the part of Depelchin.[16]

Metzger also argues Depelchin's billing was fraudulent because it included "the showing of R-rated movies to a three-year-old...." [17] The record indicates that Larry and others were shown the movie for a therapeutic purpose, but does not go into specifics. In any event, billing for the showing of the movie to Larry is not itself evidence of fraud.[18]

We affirm the directed verdict regarding Metzger's RICO claim.

### H. Intentional infliction of emotional distress

 Under this cause of action, Metzger complains "of the conduct of the Defendants in falsely branding him a child abuser." It is not our place to say whether Metzger abused Larry; that issue is not presented in this case, and we have not decided it. However, the record indicates support for those defendants who believed Metzger was abusing Larry. The tort of intentional infliction requires "outrageous conduct"—conduct that is outside all possible bounds of decency, reprehensible, and completely intolerable in a civilized community. *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993).[19] Considering the record, determining that Metzger was abusing Larry—regardless of the truth or falsity of that determination—was not "outrageous conduct."

As the defendants argued in their motion for directed verdict, there is no proof in this record of any "outrageous conduct" on the part of any defendant. We affirm the directed verdict regarding intentional infliction of emotional distress.

### 3. Conclusion

 After considering all of the evidence in the light most favorable to Metzger, and disregarding all contrary evidence and inferences, we hold that trial court did not err in directing a verdict for the defendants as to all causes of action. We overrule Metzger's third and seventh points of error and affirm that part of the judgment.[20]

## IV. Recusal

### 1. The motions for sanctions

On April 29, 1992, Lilly, Nass, and Piro & Lilly filed a motion for sanctions against Metzger, Bradt, and Izen. On May 7, Baylor, Kendrick, Cox, Lohner, and Hodges filed

---

**16.** The trial court, acting on defense objections that the evidence was irrelevant, excluded the report. Metzger does not present argument or authority regarding why the exclusion was error, and thus he waived any complaint. *Wise v. De-Toca,* 761 S.W.2d 467, 469 (Tex.App.—Houston [14th Dist] 1988, no writ); Tex.R.App.P. 74(f). In any case, we agree that the evidence was irrelevant.

**17.** Metzger states that the movie "caused [Larry] to have day terrors and nightmares." The record does not support this conclusion.

**18.** We are not persuaded by Metzger's theory that the mental health field is itself a fraud. He labels psychology a "pseudo-science" and writes that "the psychologists and psychiatrists continue to prosper amid the wreckage of the lives that they have destroyed with their grossly inadequate and improper treatment." We disagree with this

blanket indictment. We also note that the insurance company which paid Depelchin for Larry's treatment specifically stated that it found no fault with Depelchin's billing.

**19.** The elements of the tort are (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. *Twyman,* 855 S.W.2d at 621.

**20.** We also note that, under this record, appellees Sebek, Guez, and Taylor are immune from liability via Tex.Fam.Code Ann. § 34.03 (Vernon Supp. 1994). The appellees pled this immunity, and argued it in their motion for directed verdict. Under the language of section 34.03(a), however, only the appellees listed above would qualify for immunity here.

their motion for sanctions. Depelchin also filed a motion for sanctions on that date. On May 12, Taylor filed her motion for sanctions, and on May 14, Sebek filed hers.[21]

No motion was set for a hearing, however, until May 12, when Taylor gave notice that her motion would be heard on May 15. Other defendants then followed suit, giving notice that the hearing on their respective motions would be also on May 15. These notices, however, were all filed after May 12.

Thus, at the earliest, Metzger, Bradt, and Izen had notice of the May 15 hearing on May 12, just three days before the hearing. On May 12, Bradt moved to recuse the judge; Metzger and Izen did not. The judge refused to hear Bradt's motion, ruling that the motion to recuse was untimely, and thus in violation of Texas Rule of Civil Procedure 18a(a).

■ In his eighth and ninth points of error, Bradt complains that the judge erred by proceeding with the sanctions hearing against him in the face of his motion to recuse.[22] We agree.

■ Rule 18a(a) states that a motion to recuse must be filed "[a]t least ten days before the date set for trial or other hearing...." TEX.R.CIV.P. 18a(a). As the appellees point out, we have held that the mandatory "recuse or refer" provisions of rule 18a do not come into play unless the motion to recuse is timely filed. *Houston N. Properties v. White*, 731 S.W.2d 719, 722 (Tex. App.—Houston [1st Dist.] 1987, writ dism'd); *Petitt v. Laware*, 715 S.W.2d 688, 692 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.).

This case, however, is different. We agree that Bradt's motion was technically untimely under rule 18a(a), because it was not filed at least 10 days before the hearing on the de-

fendants' motions for sanctions. However, Bradt did not even get 10 days notice of the hearing; his earliest notice was on May 12, only three days before the hearing.[23] Where the movant in a motion to recuse does not receive 10 days notice of the hearing on the matter from which he seeks to recuse the judge, the 10–day requirement of rule 18a(a) cannot apply. A contrary holding would be unreasonable; we cannot require a litigant to comply with a rule in a situation in which compliance, through no fault of his own, is impossible. Until the defendants filed their notices of a hearing on the motions for sanctions, Bradt was entitled to treat those motions as potential nullities. "A court is not required to consider a motion that is not called to its attention." *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 179 (Tex.App.—Waco 1987, writ denied). Bradt had no need to move the judge to recuse himself from a sanctions hearing until the motions for sanctions were *set* for a hearing. The amount of time between the date the motions were set for a hearing and the date of the hearing left him no chance to file a timely rule 18a motion to recuse, as was his right. Thus, we do not apply the 10–day requirement of rule 18a(a) to these facts.

■ When Bradt filed his motion to recuse, the judge should have either recused himself or asked the presiding judge of the administrative judicial district to assign a judge to hear the motion. *Carson v. Gomez*, 841 S.W.2d 491, 492–93 (Tex.App.—Houston [1st Dist.] 1992, no writ) (quoting *Greenberg, Fisk & Fielder v. Howell*, 676 S.W.2d 431, 433 (Tex.App.—Dallas 1984, no writ)); TEX. R.CIV.P. 18a(c). He did neither, and there were no other options. *Greenberg, Benson, Fisk & Fielder v. Howell*, 685 S.W.2d 694, 695 (Tex.App.—Dallas 1984, orig. proceeding); *see Carson*, 841 S.W.2d at 492–93

---

21. When Guez moved for sanctions is unclear in the record.

22. Metzger and Izen, neither of whom moved to recuse the judge, did not object to untimely notice of the hearing, did not request a continuance, and announced at the hearing that they were ready to proceed.

 Metzger, however, complains that the judge erred by proceeding with the sanctions hearing

against Bradt in the face of Bradt's motion to recuse. Because the part of the judgment that sanctions Bradt does not affect Metzger, Metzger cannot complain about it on appeal. *See Gibson*, 97 S.W.2d at 352. We therefore overrule Metzger's fifth point of error.

23. Bradt pointed this out to the judge at the hearing.

**50**

(quoting *Greenberg, Fisk & Fielder*, 676 S.W.2d at 433); *General Motors Corp. v. Evins*, 830 S.W.2d 355, 357 (Tex.App.—Corpus Christi 1992, orig. proceeding); TEX. R.CIV.P. 18a(c). We therefore sustain Bradt's eighth and ninth points of error, reverse the judgment to the extent that it sanctions Bradt (because the sanctions hearing should not have proceeded against Bradt in the face of Bradt's motion to recuse), and order the judge, on remand, to comply with the requirements of rule 18a(c). *See Greenberg, Fisk & Fielder*, 676 S.W.2d at 433 (requiring judge to either enter an order recusing himself or enter an order referring the motion to recuse to the presiding judge of his administrative district).[24]

### 2. Voluntary recusal

In Bradt's thirteenth and fourteenth points of error, and in Izen's fourteenth and fifteenth, Bradt and Izen argue that the judge erred in not voluntarily recusing himself[25] or "disclosing his connections with the appellees in order that appellants might timely move to recuse him." We disagree.

Although their references to facts under these points of error are at best vague—they refer to "connections," "ties," and "illegal ex parte contacts" between the judge and unspecified appellees—we presume that Bradt and Izen refer to the following: (1) the judge clerked for one of the defense attorneys years earlier, and his son clerked for the firm that employs another, although the son was not employed by that firm at the time of trial; (2) one of the firms involved in the trial had earlier invited the judge to one of its firm retreats; (3) the judge had dined several times at a restaurant owned by one of the defense attorneys; and (4) some of the defense firms had earlier made campaign contributions to the judge.

We note initially that there are no "illegal ex parte" contacts reflected in the record. No appellant attempted to recuse the judge on this basis.

Rule 18b(2) lists those instances in which a judge should recuse himself. None of the above situations come within the ambit of that rule; not one of the facts, on its face, provides good reason to question the judge's impartiality. *See Aguilar v. Anderson*, 855 S.W.2d 799, 802 (Tex.App.—El Paso 1993, writ denied); *Texaco v. Pennzoil*, 729 S.W.2d at 842–45.

We overrule Bradt's thirteenth and fourteenth points of error and Izen's fourteenth and fifteenth points of error.

## V. Sanctions

After trial, the judge held a hearing on the defendants' motions for sanctions. The judge imposed sanctions against Metzger, Bradt, and Izen, jointly and severally, in the total amount of $994,000 plus interest. The appellants complain of this action in Metzger's first and second points of error, Bradt's first through seventh points of error, and Izen's first through tenth points of error.

### 1. The trial court's power

Texas trial courts have the power to punish abuses of the legal process. The court's authority to punish certain abuses has been codified in various rules and statutes. *See, e.g.*, TEX.R.CIV.P. 13 (improper pleadings, motions, and "other papers"); TEX.R.CIV.P. 21b (failure to serve or deliver copies of pleadings and motions); TEX.R.CIV.P. 215 (abuse of discovery); TEX.FAM.CODE ANN. § 34.032 (Vernon Supp.1994) (frivolous claims brought against persons reporting child abuse).

The court's power to sanction for abuse of the legal process is not, however, limited to that specifically conveyed in rules

---

24. We reject the appellees' argument that Bradt's motion to recuse "failed to establish a proper basis for recusal," and therefore the judge could ignore it. This is the same argument we rejected in *Carson*, 841 S.W.2d at 493. The judge who has been asked to recuse should not be the one who determines whether the motion states valid grounds for recusal. *See id.*

25. Under rule 18b(2), judges may voluntarily recuse themselves from proceedings in which their impartiality might reasonably be questioned. *Dunn v. County of Dallas*, 794 S.W.2d 560, 562 (Tex.App.—Dallas 1990, no writ). That a party has filed a motion to recuse is not a prerequisite to a judge recusing him- or herself under this rule. *Id.*

and statutes. Such a power may be *implicit* in a particular rule or statute. *See Koslow's v. Mackie,* 796 S.W.2d 700, 703 (Tex.1990) (although TEX.R.CIV.P. 166 does not provide for sanctions, court held that judge had "power implicit under rule 166 to provide in his pretrial order that the refusal to participate in the status conference or the failure to file a timely joint status report would result ... [in] 'dismissal, default, or other sanctions....'"). Trial courts also have inherent powers on which they may call to administer justice and preserve their dignity and integrity. *Public Util. Comm'n v. Cofer,* 754 S.W.2d 121, 124 (Tex.1988); *Eichelberger v. Eichelberger,* 582 S.W.2d 395, 398 (Tex.1979). This power includes the ability to sanction bad faith conduct that occurs during the course of litigation. *Lawrence v. Kohl,* 853 S.W.2d 697, 700 (Tex.App.—Houston [1st Dist.] 1993, no writ); *Kutch v. Del Mar College,* 831 S.W.2d 506, 509 (Tex.App.—Corpus Christi 1992, no writ). In *Kutch,* the court specifically held that Texas trial courts have the inherent power to sanction for abuses of the judicial process which may not be covered by rule or statute. 831 S.W.2d at 510. As we did in *Lawrence,* 853 S.W.2d at 700, we voice our approval of *Kutch,* and we now adopt this particular holding as our own.[26]

### 2. The standard of review

■ When an order of sanctions refers to one specific rule, either by citing the rule, tracking its language, or both, we are confined to determining whether the sanctions are appropriate under that particular rule. *See Lawrence,* 853 S.W.2d at 701; *Owens–Corning Fiberglas Corp. v. Caldwell,* 807 S.W.2d 413, 415 (Tex.App.—Houston [1st Dist.] 1991, orig. proceeding). The judgment states that "came on to be heard the motions of each of the defendants ... for sanctions pursuant to Texas Rules of Civil Procedure

13." The judgment also tracks some of the language of rule 13. Conversely, no other rule or other basis for sanctions, including the trial court's inherent power to sanction, is cited or otherwise referred to in the judgment. We will thus confine our review to whether the sanctioning of Metzger, Bradt, and Izen for violating rule 13 was appropriate. We review sanctions assessed under rule 13 with an abuse of discretion standard. *Kutch,* 831 S.W.2d at 512.

The appellees argue that we may consider the trial court's inherent power to sanction in determining whether the sanctions are proper in this case. Pursuant to *Lawrence* and *Owens–Corning,* we disagree. Where the court, in imposing sanctions, does not rely on its inherent power to sanction, we may not consider that power as a basis for the sanctions on our review of the sanctions. *Owens–Corning,* 807 S.W.2d at 415–16; *see Lawrence,* 853 S.W.2d at 701. Therefore, we are confined to determining whether the sanctions are proper under rule 13—the only authority for sanctions relied on in the judgment—and thus we do not consider all of the behavior referred to by the appellees that is *not* implicated under rule 13, which only addresses the signing of pleadings, motions, and "other papers."[27]

### 3. Analysis and resolution

■ As noted above, the judge should have recused himself from determining whether Bradt should be sanctioned. As such, the sanctions against Bradt cannot stand, and we have above reversed that part of the judgment and remanded with instructions. We pause here to limit the consideration of whatever trial court determines whether Bradt should be sanctioned to whether Bradt should be sanctioned for violating *rule 13.* The only basis for the judge's attempted sanctioning of Bradt was that he had violated rule 13. The parties and the

**26.** Naturally, there are limitations to this inherent power to sanction. *See Lawrence,* 853 S.W.2d at 700; *Kutch,* 831 S.W.2d at 510–11.

**27.** The appellees also argue that the sanctions were actually imposed in part under Texas Rule of Civil Procedure 215, because rule 13 "incorporates" rule 215. This argument is untenable. Rule 13 states that the court, in punishing a

violation of rule 13, shall impose an appropriate sanction from those available under rule 215–2b. TEX.R.CIV.P. 13; *Lawrence,* 853 S.W.2d at 699. This does not amount to a blanket "incorporation" of rule 215 such that a sanction under rule 13 could also automatically be said to be based, even in part, on rule 215.

court are bound, on our remand, to a determination only of whether Bradt violated that particular rule (and, if so, what amount in sanctions should be assessed). We proceed to determine whether the sanctioning of Metzger and Izen for violating rule 13 was appropriate.

Rule 13 states in pertinent part:

The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment.... If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, after notice and hearing, shall impose an appropriate sanction available under Rule 215-2b, upon the person who signed it, a represented party, or both.

No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order. "Groundless" for purposes of this rule means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law.

TEX.R.CIV.P. 13. "Rule 13 affords a court the option of imposing sanctions for pleadings, motions, or other papers signed in violation of the prohibition against filing documents that are groundless and brought in bad faith or groundless and brought for the purpose of harassment." *Johnson v. Smith,* 857 S.W.2d 612, 617 (Tex.App.—Houston [1st Dist.] 1993, orig. proceeding).

A party seeking sanctions has the burden of establishing its right to relief. *GTE Communications Sys. Corp. v. Tanner,* 856 S.W.2d 725, 729 (Tex.1993). Because rule 13 "prescribes that courts presume that papers are filed in good faith," the party moving for sanctions for a violation of rule 13 has the burden of overcoming this presumption. *Id.* at 731.

## A. Izen

Regarding Izen, we note that he did not enter this case until December of 1991, over a year from the time it was filed in state court. The only "pleading, motion, or other paper" Izen signed was his appearance of record, and none of the appellees claim that Izen should be sanctioned under rule 13 for filing this particular document. Sanctions for violating rule 13 can only be assessed against an attorney when he or she has actually signed the offending pleading, motion, or other paper. *Tanner,* 856 S.W.2d at 730. Because Izen cannot be sanctioned under rule 13 on the basis of a "pleading, motion, or other paper" not signed by him, and because the single "pleading, motion, or other paper" signed by Izen could not have been a proper predicate for rule 13 sanctions against him, the sanctions against Izen for violating rule 13 cannot stand.

We sustain Izen's fifth point of error, under which he contends that he should not have been sanctioned under rule 13 because he did not violate that rule. We reverse the part of the judgment that assesses sanctions against Izen, and render judgment that no sanctions be imposed against him.

## B. Metzger

Regarding Metzger, we note that, in assessing sanctions for violating rule 13, a party should not be punished for its counsel's conduct "unless the party is implicated apart from having entrusted its legal representation to counsel." *Glass v. Glass,* 826 S.W.2d 683, 687 (Tex.App.—Texarkana 1992, writ denied). Metzger signed an affidavit that supported a response to a motion for summary judgment filed by five of the defendants. The affidavit was, of course, prepared by Metzger's counsel, but Metzger supplied the information, read the affidavit before it was filed, and swore therein that he had "personal knowledge of all facts which are set forth in this affidavit and they are true and correct." However, it later became clear that Metzger did not have personal knowledge of several of the alleged facts stated in his affidavit, including that Guez wrote the Hodges notes and facts concerning Baylor's use of the mails, which pertained to

Metzger's RICO claims. Metzger subsequently admitted that he did not have the personal knowledge that he swore in the affidavit that he had.[28]

■ The appellees contend that Metzger's act is sufficient to uphold the sanctions against him. We agree that his act is sanctionable; lying in an affidavit is a despicable, shameful act. The rules that permit sanctions exist because of acts like this one.[29] In this regard, we agree with the appellees that they met their burden of establishing their right to sanctions against Metzger. We do not agree, however, that the sanction imposed—exposure to joint and several liability for $994,000 plus interest—is justified by this one act, which is the only act we find Metzger committed that violated rule 13.

■ Rule 13 requires that the sanctions assessed be "appropriate." *Tanner,* 856 S.W.2d at 731. Rule 13's "appropriate" standard is equivalent to rule 215's "just" standard. *Id.* Thus, to determine whether sanctions imposed for violating rule 13 are "appropriate," we employ the same test used to determine whether sanctions imposed for violating rule 215 are "just." *See Glass,* 826 S.W.2d at 688. In order to decide whether the sanctions imposed are just, we must (1) determine whether a direct relationship exists between the offending conduct and the sanctions imposed, and (2) whether the sanctions are excessive. *Transamerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex.1991); *Glass,* 826 S.W.2d at 688–89.[30]

The first prong of the "justness" test focuses on whether the sanction is directed against the abuse and toward remedying the prejudice caused the innocent parties.

*Transamerican,* 811 S.W.2d at 917. It also focuses on whether the sanction was visited upon the actual offender. *Id.* The second prong focuses on whether the punishment fits the crime; a sanction should be no more severe than necessary to satisfy its legitimate purposes, and courts must consider the availability of sanctions less stringent than those ultimately imposed. *Id.*

The sanction imposed against Metzger does not pass the second part of the "justness" test. The sanction is excessive. It is more severe than necessary to adequately punish Metzger for lying in the affidavit; Metzger's punishment did not fit his crime, even considering the disgraceful nature of the crime. The judge abused his discretion. The amount of the sanction to which Metzger faces exposure must be reduced.

We sustain Metzger's first and second points of error to the extent that they argue that the sanction imposed against him was excessive. We hold that the trial court did not err in sanctioning Metzger, but that the part of the judgment setting the sanctions at joint and several liability for $994,000 plus interest cannot stand. We therefore affirm the part of the judgment imposing sanctions against Metzger, but reverse the part of the judgment that sets the sanctions at joint and several liability for $994,000 plus interest. We remand that part of the judgment for the judge to redetermine, in light of the second prong of the "justness" test discussed in this opinion, the amount that Metzger should be sanctioned for violating rule 13.

■ We overrule Metzger's first and second points of error to the extent that they argue that the part of the judgment assessing sanctions is void.[31] We overrule Izen's

---

**28.** Testimony at the sanctions hearing showed that the defendants in response to whose motions for summary judgment Metzger had filed a false affidavit passed the hearing on their motions because they were certain that Metzger's affidavit had raised fact issues, and their motions would be denied.

**29.** In his dissent in *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), Justice Kennedy observed that sanctions are allowed because of conduct that "degrades the profession and disserves justice." *Id.* at 76, 111 S.Ct. at 2149 (Kennedy, J., dissenting). Ly-

ing in an affidavit most certainly "disserves justice."

**30.** Furthermore, the due process clause requires that there be a reasonable relationship between the sanctionable act committed and the sanctions assessed. *See Glass,* 826 S.W.2d at 688. The absence of a reasonable relationship between the two constitutes an abuse of discretion. *See id.*

**31.** Metzger, Izen, and Bradt contend that the sanctions are void because good cause for the sanctions, and the particulars of good cause, are not stated in the judgment; because they were

first through fourth and his sixth through tenth points of error to the extent that they argue that the part of the judgment assessing sanctions is void.[32] We overrule Bradt's first through seventh points of error to the extent that they argue that the part of the judgment assessing sanctions is void, and to the extent that they argue that Bradt should not be sanctioned at all. The sanctions order is not void.[33] We leave the determination of whether Bradt should be sanctioned for violating rule 13 to whatever trial court addresses the issue on remand.

## VI. Contempt

In his fifteenth point of error, Bradt argues that the judge abused his discretion by holding him in contempt. The judge held Bradt in contempt twice, once on April 10, and once on April 29.

After he was held in contempt, Bradt moved for the determination of guilt or innocence of contempt by a judge other than the one who had held him in contempt. *See* TEX.GOV'T CODE ANN. § 21.002(d) (Vernon Supp.1994). The presiding judge of the administrative judicial region assigned another judge to determine Bradt's guilt or innocence. *See id.* The assigned judge dismissed the contempt charges that resulted from Bradt's conduct on April 10.[34]

### 1. The trial court's power

■ Texas trial courts have an inherent power to punish for contempt. *Ex parte Pryor*, 800 S.W.2d 511, 512 (Tex.1990); *Owens–Corning*, 807 S.W.2d at 415. This inherent power has been codified in the Texas

Government Code. *See* TEX.GOV'T CODE ANN. §§ 21.001, 21.002 (Vernon 1988).

The power to punish for contempt is "an essential element of judicial independence and authority." *Pryor*, 800 S.W.2d at 512. The power "enables courts to persuade parties to obey an order or decree of the court so that the order will not be rendered ineffectual by recalcitrant litigants." *Id.* "[T]he underlying concern that gave rise to the contempt power was not ... merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial." *Chambers*, 501 U.S. at 44, 111 S.Ct. at 2132 (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798, 107 S.Ct. 2124, 2132, 95 L.Ed.2d 740 (1987)).

### 2. Our jurisdiction

■ Decisions in contempt proceedings are not appealable. *Ex parte Williams*, 690 S.W.2d 243 n. 1 (Tex.1985); *Ex parte Cardwell*, 416 S.W.2d 382, 384 (Tex.1967); *Mendez v. Attorney Gen. of Texas*, 761 S.W.2d 519, 521 (Tex.App.—Corpus Christi 1988, no writ); *Smith v. Holder*, 756 S.W.2d 9, 10–11 (Tex.App.—El Paso 1988, no writ); *Gensco, Inc. v. Thomas*, 609 S.W.2d 650, 651 (Tex. Civ.App.—San Antonio 1980, no writ); *Anderson v. Burleson*, 583 S.W.2d 467 (Tex. Civ.App.—Houston [1st Dist.] 1979, no writ). This is so even where the contempt order is being appealed along with a judgment that is appealable. *See Mendez*, 761 S.W.2d 519; *Gensco*, 609 S.W.2d at 650; *Grace v.*

---

sanctioned for events that occurred while the case was still in federal court; because Metzger's pleadings "had survived motions for summary judgment"; because the sanctions constituted "fee shifting"; and because the law was "unsettled" regarding Metzger's RICO claims. The judgment most definitely states good cause and its "particulars." We are unable to find any indication in the judgment, or that part of the record supporting it, that Metzger, Bradt, or Izen was sanctioned for events that occurred in federal court or that the judge awarded the sanctions as some sort of impermissible fee shifting. Further, that a client's pleadings "survive[ ] motions for summary judgment" does not mean that they cannot be the basis of rule 13 sanctions. That is particularly true here, where only four of the 12 defendants asked the trial court to rule on a

motion for summary judgment. Nor do we believe that Metzger's RICO claim was "an innovative use" of RICO, and thus should not be the basis of rule 13 sanctions. As noted above, Metzger did not even have the standing necessary to bring a RICO claim.

32. *See* note 30, *supra.*

33. *See* note 30, *supra.*

34. The dismissal order concludes with the following language: "[T]he Court is of the opinion that the Respondent, L.T. Bradt, is entitled to a dismissal of the contempt charges made against him, and it is so ordered."

*McCrary,* 390 S.W.2d 397 (Tex.Civ.App.— Waco 1965, writ dism'd).

The validity of a contempt order can be attacked only by a writ of habeas corpus. *Williams,* 690 S.W.2d at 243 n. 1; *Saenz v. Saenz,* 756 S.W.2d 93, 95 (Tex.App.—San Antonio 1988, no writ); *Anderson,* 583 S.W.2d at 467; *but see Deramus v. Thornton,* 160 Tex. 494, 497–98, 333 S.W.2d 824, 827 (1960) (stating that there may be circumstances in some contempt proceedings that would make a remedy by habeas corpus inadequate, and that would therefore implicate mandamus relief); *Kidd v. Lance,* 794 S.W.2d 586, 587 n. 1 (Tex.App.—Austin 1990, orig. proceeding) (citing *Deramus* and holding that mandamus is the "only" available remedy where there is no order of confinement); *International Ass'n of Machinists & Aerospace Workers v. Axelson, Inc.,* 593 S.W.2d 362, 363 (Tex.Civ.App.—Texarkana 1979, no writ). Bradt has not applied for habeas or mandamus relief, but has instead attempted to appeal from the contempt proceedings below.

### 3. Resolution

■ Considering the above authorities, we hold that we have no jurisdiction to hear Bradt's appeal from the contempt proceedings. The question of what specific disposition to make of Bradt's fifteenth point of error remains.

In both *Mendez* and *Gensco,* part of the appeal was from an appealable judgment, and part of the appeal was from an order of contempt, which is not appealable. *Mendez,* 761 S.W.2d 519; *Gensco,* 609 S.W.2d 650. In both cases, the court of appeals overruled the points of error complaining of the contempt order and disposed of the entire appeal by affirmance. *Mendez,* 761 S.W.2d at 521, 522; *Gensco,* 609 S.W.2d at 651, 652.

In *Grace,* too, part of the appeal was from an appealable judgment, and part of the appeal was from an order of contempt. 390 S.W.2d 397. The court, rather than overruling the point of error complaining of the contempt order, wrote that "this court is without jurisdiction to review the portion of this appeal as relates to the contempt proceeding," and held that the appellant's "point related thereto is accordingly dismissed." *Id.* at 398. The court stated at the end of its opinion that the judgment is affirmed, but that the appeal as it pertains to the order of contempt is dismissed. *Id.*

We choose the route taken by the *Grace* court. Where a court of appeals has no jurisdiction to hear an appeal from an order, it dismisses the appeal. *See, e.g., Pierce Mortuary Colleges, Inc. v. Bjerke,* 841 S.W.2d 878 (Tex.App.—Dallas 1992, no writ) (order amending class certification); *Pelt v. State Bd. of Ins.,* 802 S.W.2d 822 (Tex.App.— Austin 1990, no writ) (order resolving discovery dispute); *Conley v. Pompa,* 627 S.W.2d 512 (Tex.App.—Corpus Christi 1982, no writ) (order granting new trial). It does not overrule the points of error. The same rule should apply in a case in which a court of appeals has no jurisdiction to consider *part* of the appeal. It should dismiss the part over which it has no jurisdiction, not overrule the points that relate to that part.[35] This action vindicates the rule that we *dismiss* that over which we have no jurisdiction. *See Conley,* 627 S.W.2d at 513.

For want of jurisdiction, we dismiss Bradt's appeal to the extent that it complains of the decisions made in the contempt proceedings (his fifteenth point of error).[36]

## VII. Conclusion

We affirm the part of the judgment that grants all of the appellees a directed verdict on all of Metzger's causes of action.

---

**35.** Injunction cases are a good example of this principle. When a portion of an order is injunctive, that part of the order is appealable, even though another portion of the order may be interlocutory and unappealable. *Eichelberger v. Hayton,* 814 S.W.2d 179, 182 (Tex.App.—Houston [1st Dist.] 1991, writ denied). In considering such an order, we rule on the points of error complaining of the appealable injunction, and dismiss for want of jurisdiction the part of the appeal that arises from the unappealable portion of the order. *See id.*

**36.** We also note that, because the contempt charges relating to Bradt's conduct on April 10 were dismissed, the question of whether the judge erred in holding Bradt in contempt on April 10 would be moot.

We reverse the part of the judgment that imposes sanctions against Bradt and remand to the trial court with instructions that (1) the judge, on remand, comply with the requirements of rule 18a(c), and (2) the consideration of whatever trial court determines whether Bradt should be sanctioned be limited to whether Bradt should be sanctioned for violating rule 13.

We reverse the part of the judgment that assesses sanctions against Izen and render judgment that no sanctions be imposed against him.

We affirm the part of the judgment imposing sanctions against Metzger, but reverse the part of the judgment that sets the sanctions at joint and several liability for $994,000 plus interest. We remand that part of the judgment for the judge to redetermine, in light of the second prong of the "justness" test discussed in this opinion, the amount that Metzger should be sanctioned for violating rule 13.

We dismiss Bradt's appeal to the extent that it complains of the decisions made in the contempt proceedings (his fifteenth point of error).