**Opinion issued December 16, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-24-00576-CV

————————————

**ANUM SATTAR, Appellant**

**V.**

**RYAN Z. HAZLITT, Appellee**

On Appeal from the 280th District Court
Harris County, Texas
Trial Court Case No. 2024-28779

## MEMORANDUM OPINION

This is an appeal of a protective order granted in favor of Ryan Hazlitt, and against Anum Sattar, under Chapter 7B of the Texas Code of Criminal Procedure due to stalking and harassment. Sattar now challenges the sufficiency of the evidence supporting the protective order. We affirm.

## Background

Sattar and Hazlitt met on a dating app and dated for approximately one year. During that time, Sattar became pregnant, and she told Hazlitt that he was the father. Sattar then suffered a miscarriage. A few months after that, Sattar and Hazlitt stopped dating when Hazlitt moved out of state—but they remained friends. Hazlitt testified that because of Sattar's miscarriage, he wanted to be a supportive friend. Meanwhile, Sattar kept the fetal tissue in a candy bag in her freezer and referred to it by the name "Grapeseed."

During the next two years, Sattar and Hazlitt continued to stay in touch by texting each other. Hazlitt then told Sattar that he had found someone new and that she needed to move on too. Sattar, however, demanded that the two meet up, and she held the miscarriage over Hazlitt's head and threatened to tell his family.

Hazlitt agreed to meet Sattar at a Starbucks because she wanted to discuss the miscarriage and "closure." Hazlitt testified that the meeting was "supposed to be [about] closure but it evolved into a plea for rekindling of a relationship." Hazlitt texted Sattar afterwards stating, "We can't be friends because you keep trying to make it seem like we're getting together," and "You need to find another person to give you that peace."

Nevertheless, Sattar continued to text Hazlitt frequently about meeting again. She wanted their families to get together and bury "Grapeseed," the fetal tissue she

had saved and kept frozen for two years. Sattar refused and responded, "[Y]ou need to move on . . . we are not together."

Hazlitt then received more than 100 text messages from Sattar, and dozens of phone calls at inappropriate hours, during the next month and a half. Hazlitt did not respond to any of them. The constant barrage from Sattar made Hazlitt feel "harassed, embarrassed, tensed, stressed out." During one of the texts, Sattar told Hazlitt, "I want to put a lawsuit on you." She also told him, "[M]y dad will confront you in person as well. I don't care how many years it will take," and "I'm still taking you to court and my dad will break your neck and I'm messaging your mom." Hazlitt testified that he took Sattar's threats seriously because "she [had] lived in the same neighborhood as the Pakistani president and she had insinuated that [her father] could hire people to come and hurt me if she wanted to."

Sattar then showed up at Hazlitt's home unannounced while he was at work. Sattar introduced herself as Hazlitt's girlfriend to his wife—who was home alone with a newborn baby—and demanded to speak to him. Hazlitt's wife called him at work, and he raced home fearing for the safety of his family. He testified that he felt "stalked and harassed."

When Hazlitt arrived home, he told Sattar to leave immediately—but she refused. Hazlitt told her, "If you do not leave, I will call the police[,]" which he did. Hazlitt told the responding officers that he did not want to press charges, he just

wanted Sattar to leave. The police handcuffed Sattar and took her away. They did not arrest her and dropped her off at a nearby Starbucks.

Hazlitt then sought this protective order against Sattar. After a temporary protective order was served on Sattar, she filed her own request for a protective order in Collin County. After Sattar's request was denied,[1] she filed a police report in Collin County claiming that Sattar had raped her. The police investigated Sattar's claim and determined that her charges were "unfound[ed]."

At the conclusion of Hazlitt's protective-order hearing, the trial court found that Hazlitt and Sattar "were previously in a dating relationship," that Hazlitt was "a victim of STALKING and HARASSMENT" by Sattar, and prohibited Sattar from committing family violence, or communicating with, threatening, or going near Hazlitt's residence, among other things. This appeal by Sattar followed.

## Sufficiency of the Evidence

Sattar contends that the evidence is insufficient to support the trial court's protective order. Although she does not specify whether she is challenging the legal or factual sufficiency of the evidence, we will consider it a challenge to both.

---

[1]   Sattar appealed the denial of her protective order in Collin County, and the Fifth Court of Appeals has since affirmed the denial of her protective order. *See Sattar v. Hazlitt*, No. 05-24-00733-CV, 2025 WL 1805800 (Tex. App.—Dallas July 1, 2025, no pet.) (mem. op.).

**A. Standards of Review**

"When the trial court acts as a factfinder, we review its findings under the legal and factual sufficiency standards." *Boyd v. Palmore*, 425 S.W.3d 425, 429 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000)). When, as here, a party who does not have the burden of proof at trial challenges the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor and disregarding contrary evidence unless a reasonable factfinder could not. *Jones v. Frazier*, No. 01-21-00297-CV, 2022 WL 3588752 at *4 (Tex. App.—Houston [1st Dist.] Aug. 23, 2022, pet. denied) (*citing City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)).

We may not sustain a legal sufficiency, or "no evidence" point, unless the record demonstrates (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Gabel v. Gabel-Koehne*, 649 S.W.3d 590, 599 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (citing *City of Keller*, 168 S.W.3d at 810).

If more than a scintilla of evidence exists to prove a vital fact, the evidence is legally sufficient, and we will overrule the issue. *Haggar Clothing Co. v. Hernandez*,

164 S.W.3d 386, 388 (Tex. 2005). There is more than a scintilla of evidence if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (*citing Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

When a party attacks the factual sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Jones*, 2022 WL 3588752 at *4. In conducting a factual-sufficiency review, we examine the entire record. We consider and weigh all evidence that supports or contradicts the fact finder's determination. *Id.*

"It is the fact finder's role to resolve conflicts in the evidence, and we may not substitute our judgment for that of the fact finder." *Id.* at *5. After considering and weighing all the evidence, we will set aside the order only if the evidence is so weak, or the finding is so against the great weight and preponderance of the evidence, that it is "clearly wrong and unjust." *Id.*

### B. Governing Law

To issue the protective order here, the trial court had to find that "there are reasonable grounds to believe that" Hazlitt was "a victim of . . . stalking." *See* TEX. CODE CRIM. PROC. art. 7B.003(a). A criminal conviction is not required. *Bevers v.*

*Mabry*, No. 05-22-00713-CV, 2024 WL 469550, at *7 (Tex. App.—Dallas Feb. 7, 2024, pet. denied) (mem. op.).

The stalking statute provides that a person commits an offense if "on more than one occasion and pursuant to the same scheme or course of conduct that is directed at a specific other person," the actor

> knowingly engages in conduct that:
>
> (1) constitutes an offense under Section 42.07 [Harassment], or that the actor knows or reasonably should know the other person will regard as threatening:
>
>> (A) bodily injury or death for the other person; or
>>
>> (B) that an offense will be committed against:
>>
>>> (i) a member of the other person's family or household;
>>>
>>> (ii) an individual with whom the other person has a dating relationship; or
>>>
>>> (iii) the other person's property;
>
> (2) causes the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship:
>
>> (A) to be placed in fear of bodily injury or death or in fear that an offense will be committed against the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship, or the other person's property; or

(B) to feel harassed, terrified, intimidated, annoyed, alarmed, abused, tormented, embarrassed, or offended; and

(3) would cause a reasonable person under circumstances similar to the circumstances of the other person to:

(A) fear bodily injury or death for the person;

(B) fear that an offense will be committed against a member of the person's family or household or an individual with whom the person has a dating relationship;

(C) fear that an offense will be committed against the person's property; or

(D) feel harassed, terrified, intimidated, annoyed, alarmed, abused, tormented, embarrassed, or offended.

TEX. PENAL CODE § 42.072(a).

The stalking statute thus prohibits conduct that constitutes a harassment offense as well as conduct that the actor knows or reasonably should know that the other person will regard as threatening bodily injury, death, or a property offense. *Bevers*, 2024 WL 469550, at *7. Under Section 42.072(c) of the Penal Code, a scheme or course of conduct can include different types of conduct described in Section 42.072(a) if engaged in on more than one occasion. TEX. PENAL CODE § 42.072(c).

The reference in the stalking statute to "Section 42.07" is to the harassment statute. *Id.* § 42.07. A person harasses another if, "with intent to harass, annoy, alarm, abuse, torment, or embarrass another," he "threatens, in a manner reasonably likely to alarm the person receiving the threat, to inflict bodily injury on the person,"

8

"causes the telephone of another to ring repeatedly or makes repeated telephone communications . . . in a manner reasonably likely to harass, annoy alarm, abuse, torment, embarrass, or offend another," or "sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another." *Id.* § 42.07(a)(2), (4), and (7).

Thus, a Code of Criminal Procedure protective order may be issued against a person who has, more than once, knowingly harassed another person, which caused that person to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended, and likewise, would have caused a reasonable person to feel the same way. *See id.* §§ 42.07, .072; TEX. CODE CRIM. PROC. arts. 7B.001, .003. The protective order may prohibit the offender from engaging in most of the actions described in Family Code Section 85.002(b). *See* TEX. CODE CRIM. PROC. art. 7B.005(a)(1). And it "may be effective for the duration of the lives of the offender and victim or for any shorter period stated in the order." *Id.* art. 7B.007(a).

### C. Legal-Sufficiency Analysis

Here, there is more than a scintilla of evidence to support each element of the stalking statute. First, the trial court heard evidence that Sattar engaged in conduct that either harassed or threatened bodily injury against Hazlitt. *See* TEX. PENAL CODE § 42.072(a)(1)(A-B). In that regard, the trial court heard evidence that Sattar continued to try to rekindle her romantic relationship with Hazlitt, even after he told

9

her, "We can't be friends because you keep trying to make it seem like we're getting together," and "You need to find another person to give you that peace." After they met in person at the Starbucks for "closure," Hazlitt received unwanted communications from Sattar about meeting again. She threatened to tell his family about the miscarriage, and, after Hazlitt blocked her number, she called him from another phone to demand that he unblock her.

The trial court also heard evidence that Sattar then began repeatedly texting Hazlitt and demanded that they and their families have a burial service for the fetal tissue that she had saved from her miscarriage and named "Grapeseed," to which Hazlitt responded: "[Y]ou need to move on . . . we are not together."

There is also evidence that Sattar texted Hazlitt over 100 times, with no response from Hazlitt, and that Sattar sent images of what looked to be a piece of frozen candy to Hazlitt—stating that her roommate had thrown out "Grapeseed," but that she had fished the candy bag containing the frozen fetal tissue out of the trash. Sattar also wanted Hazlitt to meet her in McKinney because she could not bring "Grapeseed" to Houston or it would melt. Sattar threatened Hazlitt with a lawsuit and said: "I'm still taking you to court and my dad will break your neck and I'm messaging your mom."

During the time that Sattar was repeatedly texting Hazlitt, without any response from him, she was also making dozens of phone calls to him at inappropriate hours

of the day and night. And, after promising Hazlitt "a surprise," Sattar arrived at Hazlitt's home in Houston unexpected and uninvited. Hazlitt had never told Sattar where he lived, but she tracked him down. Sattar confronted Hazlitt's wife, claiming to be Hazlitt's girlfriend, and demanded to speak to him. When Hazlitt arrived home, Sattar became loud and refused to leave—even after Hazlitt called the police.

This pattern of unwanted calls and emails—containing threats of physical violence, lawsuits, and public humiliation—as well as Sattar's unannounced visit to Hazlitt's home after he told her to "move on" because they were "not together," constitutes more than a scintilla of evidence that Sattar knowingly engaged in conduct constituting harassment and threatening Hazlitt with bodily injury.

Second, there was evidence before the trial court that Sattar's conduct caused Hazlitt, and would cause a reasonable person circumstances in similar to Hazlitt's, to fear bodily injury to himself or his wife or to feel harassed, terrified, intimidated, annoyed, alarmed, abused, tormented, embarrassed, or offended. *See id.* §42.072(a)(2)(A-B), (3) (A-B, D).

Hazlitt testified that he took seriously Sattar's threats to have her father "break his neck." He explained that Sattar was from a very wealthy family in Pakistan—living, in fact, in the same area as the Pakistani president—and that Sattar had had "insinuated that [her father] could hire people to come and hurt me if she wanted

11

to." There was also evidence that Hazlitt felt harassed, terrified, intimidated, annoyed, alarmed, abused, tormented, embarrassed, or offended by Sattar's conduct.

Additionally, there was evidence that Hazlitt blocked Sattar's phone number, told her to find someone else to be with, and refused to respond to over 100 text messages and dozens of telephone calls at inappropriate hours. He further testified that Sattar's conduct made him feel "harassed, embarrassed, tensed, and stressed out." Hazlitt testified that Sattar's unwanted and uninvited visit to his home made him feel "stalked and harassed." Hazlitt's testimony that he felt stalked, harassed, and embarrassed—as well as his actions in refusing to respond to Sattar's texts and phone calls and calling police upon learning of her unannounced and uninvited visit—is more than a scintilla of evidence that he felt harassed, terrified, intimidated, annoyed, alarmed, abused, tormented, embarrassed, or offended by Sattar's conduct, and that a reasonable person would feel likewise.

We thus hold that the evidence is legally sufficient to support the trial court's finding that Hazlitt was a victim of stalking.

### D. Factual-Sufficiency Analysis

Sattar points to "evidence" that she claims supports her assertion that she and Hazlitt were in a relationship. But, most, if not all of the "evidence" that she relies on was not admitted at trial. We cannot look outside the record to discover relevant facts omitted by the parties; rather, we are bound to determine this case on the record

12

as filed. *Sabine Offshore Serv., Inc. v. City of Port Arthur,* 595 S.W.2d 840, 841 (Tex. 1979). Thus, we confine our factual-sufficiency review to the evidence presented at trial.

In that regard, Sattar simply testified that she and Hazlitt were in a dating relationship from the time that they met online until she was arrested at his home. Sattar did not recall calling Hazlitt "dozens of times" and denied going to Hazlitt's house to harass him—but states in her brief that she was intending to "assist [Hazlitt] with his emotional struggles." Sattar also claimed that Hazlitt sought a protective order against her because he was afraid that she "would take him to court for his crimes."

Having heard the evidence presented by both Hazlitt and Sattar, the trial court was entitled to believe Hazlitt and to disbelieve Sattar. In a bench trial, the trial judge is the factfinder who weighs the evidence, resolves evidentiary conflicts, and evaluates witnesses' credibility. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). That the trial court resolved conflicting evidence in Hazlitt's favor does not render the evidence against the great weight and preponderance. Thus, based on the record before us, we conclude that the evidence is factually sufficient to support the trial court's finding that Hazlitt was a victim of stalking.

We overrule Sattar's challenges to the legal and factual sufficiency of the evidence.

## Bias of the Trial Court

Though not specifically designated as an issue on appeal, we next address Sattar's assertions in her brief about the trial court's alleged bias. She states that "[t]he trial court demonstrated bias by permitting [Hazlitt] to make unsubstantiated claims about [Sattar's] intentions[,]" and misinterpreting Hazlitt's statements that he "needed space." She also states that the protective order is "one-sided" and is solely against her, when she claimed to be the victimized party. And that "the trial court overlooked the multiple incidents of [Hazlitt] sending [Sattar] such harassing texts constituting stalking[.]" She claims that the trial court's statements to her when issuing the protective order "perpetuate[d] a toxic culture of victim blaming[.]

### A. Governing Law

Parties have a right to a fair and impartial trial. One of the fundamental components of a fair trial is a neutral and detached judge. *Metzger v. Sebek*, 892 S.W.2d 20, 37 (Tex. App.—Houston [1st Dist.] 1994, writ denied); *see also Ellason v. Ellason*, 162 S.W.3d 883, 887 (Tex. App.—Dallas 2005, no pet.) ("All parties have a right to a fair and impartial trial before a neutral judge."). "In the absence of clear proof to the contrary, we presume a trial judge is impartial and unbiased." *Place v. McCoy*, No. 01-20-00186-CV, 2021 WL 3500989, at *5 (Tex. App.—Houston

14

[1st Dist.] Aug 10, 2021, no pet.) (mem. op.). In that regard, a trial court has broad discretion to conduct a trial and may express itself in exercising this discretion. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001).

Remarks made by the judge "during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge"—nor do "expressions of impatience, dissatisfaction, annoyance, and even anger" establish bias or partiality. *Dow Chem.*, 46 S.W.3d at 240 (*quoting Liteky v. United States*, 510 U.S. 540, 555 (1994)). Rather, reversible bias or partiality is shown if the judge's conduct showed "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555.

Moreover, judicial rulings alone are rarely sufficient to demonstrate judicial bias or impartiality. *See Dow Chem.*, 46 S.W.3d at 240. Indeed, "[i]t is only in the rarest circumstances . . . that judicial rulings demonstrate the degree of favoritism or antagonism necessary to show that a fair and impartial trial was not possible." *Ellason*, 162 S.W.3d at 887; *see also In re E.M.*, No. 02-18-00351-CV, 2019 WL 2635565, at *3 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.) ("Allegations that a judge has put his or her thumb on the scale should not be made simply because a party disagrees with the judge's rulings.").

Accordingly, we will only reverse a judgment on the ground of improper conduct or comments by a trial court if we find (1) that judicial impropriety was in fact committed; and (2) probable prejudice to the complaining party. *Metzger*, 892 S.W.2d at 39. The complaining party bears the burden of showing harm to warrant reversal. *See Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 667 (Tex. 2009) (*citing* Tex. R. App. P. 44.1(a)).

## B. Analysis

Here, the gist of Sattar's complaints as we understand them is that the trial court's rulings somehow show bias because they disregarded or misinterpreted evidence. As described above, it is within the trial court's discretion to determine credibility and to resolve evidentiary conflicts. *See In re R.J.*, 579 S.W.3d at 117. And to the extent that Sattar is complaining about evidence that is not in the record, we note that she was represented by counsel at the hearing and had the opportunity to put on whatever evidence was relevant, but she failed to do so.

We also note that any remarks made to Sattar when the trial court entered the order must be evaluated in the context of the trial. *See, e.g., Garrett v. State*, 693 S.W.3d 490, 499-500 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd) (noting that trial court comments calling defendant a "predator" did not evidence bias because "it was only after hearing the evidence that the trial court made the challenged comments"). As such, the comments made at the time of the trial court's

16

decision and after having heard all the evidence in the case were not "victim blaming," but an indication that the trial court did not believe that Sattar was a victim.

Sattar has not carried her burden of showing any judicial bias, impropriety, or harm.

## Conclusion

Accordingly, for all of the reasons above, we affirm the trial court's protective order in all things. We overrule all pending motions.


Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Gunn and Johnson.